**HANSON TRUST PLC,**
**Plaintiff-Appellant,**

v.

**SCM CORPORATION,**
**Defendant-Appellee,**

**SCM CORPORATION,**
**Counterclaim-Plaintiff-Appellee,**

v.

**HANSON TRUST PLC,**
**Counterclaim-Defendant-Appellant,**

**and**

**HSCM Industries, Inc. and Hanson Holdings Netherlands B.V., Additional Counterclaim-Defendants-Appellants.**

**No. 412, Docket 85–7745.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1985.

Decided Sept. 30, 1985.

Barry H. Garfinkel, New York City (Jonathan J. Lerner, Peter E. Greene, Samuel Kadet, Jay B. Kasner, Jeremy A. Berman, Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel), and Dennis J. Block, New York City (Sanford F. Remz, Jonathan M. Hoff, Stephen A. Radin, Weil, Gotshal & Manges, New York City, of counsel), for Hanson Trust PLC, HSCM Industries and Hanson Holdings Netherlands B.V.

Bernard W. Nussbaum, New York City (Robert B. Mazur, Eric M. Roth, Marc Wolinsky, Barbara Robbins, Wendy P. Rosenthal, Karen Shaer, Wachtell, Lipton, Rosen & Katz, New York City, of counsel), for SCM Corp.

Daniel L. Goelzer, Gen. Counsel, S.E.C., Washington, D.C. (Linda D. Feinberg, Associate Gen. Counsel, David A. Sirignano, Asst. Gen. Counsel, Michael S. Smith, Sp. Counsel, Martha H. McNeely, James R. Brown, Attys., S.E.C., Washington, D.C., Paul Gonson, Sol., Washington, D.C., of counsel), for amicus curiae S.E.C.

Before MANSFIELD, PIERCE and PRATT, Circuit Judges.

MANSFIELD, Circuit Judge:

Hanson Trust PLC, HSCM Industries, Inc., and Hanson Holdings Netherlands B.V. (hereinafter sometimes referred to collectively as "Hanson") appeal from an order of the Southern District of New York, 617 F.Supp. 832 (1985), Shirley Wohl Kram, Judge, granting SCM Corporation's motion for a preliminary injunction restraining them, their officers, agents, employees and any persons acting in concert with them, from acquiring any shares of SCM and from exercising any voting rights with respect to 3.1 million SCM shares acquired by them on September 11, 1985. The injunction was granted on the ground that Hanson's September 11 acquisition of the SCM stock through five private and one open market purchases amounted to a "tender offer" for more than 5% of SCM's outstanding shares, which violated §§ 14(d)(1) and (6) of the Williams Act, 15 U.S.C. § 78n(d)(1) and (6)[1] and rules promulgated by the Securities and Exchange Commission (SEC) thereunder. *See* 17 C.F.R. §§ 240.14(e)(1) and 240.14d–7.[2] We reverse.

The setting is the familiar one of a fast-moving bidding contest for control of a large public corporation: first, a cash

1. Sections 14(d)(1) and (6) provide in pertinent part as follows:

"(d)(1) It shall be unlawful for any person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, to make a tender offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to section 78*l* of this title, ... if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 per centum of such class, unless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in section 78m(d) of this title, and such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. All requests or invitations for tenders or advertisements making a tender offer or requesting or inviting tenders of a security shall be filed as a part of such statement and shall contain such of the information contained in such statement as the Commission may by rules and regulations prescribe. Copies of any additional material soliciting or requesting such tender offers subsequent to the initial solicitation or request shall contain such information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors, and shall be filed with the Commission not later than the time copies

of such material are first published or sent or given to security holders. Copies of all statements, in the form in which such material is furnished to security holders and the Commission, shall be sent to the issuer not later than the date such material is first published or sent or given to any security holders.

\*       \*       \*       \*       \*       \*

"(6) Where any person makes a tender offer, or request or invitation for tenders, for less than all the outstanding equity securities of a class, and where a greater number of securities is deposited pursuant thereto within ten days after copies of the offer or request or invitation are first published or sent or given to security holders than such person is bound or willing to take up and pay for, the securities taken up shall be taken up as nearly as may be pro rata, disregarding fractions, according to the number of securities deposited by each depositor. The provisions of this subsection shall also apply to securities deposited within ten days after notice of an increase in the consideration offered to security holders, as described in paragraph (7), is first published or sent or given to security holders."

2. 17 C.F.R. § 240.14e–1(a) provides that a tender offer must be open for at least 20 business days from the date when it is first published or furnished to security holders.

17 C.F.R. § 240.14d–7 provides that any person who has deposited securities pursuant to a tender offer has the right to withdraw such securities during a period up to 15 business days from the commencement of the tender offer.

tender offer of $60 per share by Hanson, an outsider, addressed to SCM stockholders; next, a counterproposal by an "insider" group consisting of certain SCM managers and their "White Knight," Merrill Lynch Capital Markets (Merrill), for a "leveraged buyout" at a higher price ($70 per share); then an increase by Hanson of its cash offer to $72 per share, followed by a revised SCM-Merrill leveraged buyout offer of $74 per share with a "crown jewel" irrevocable lock-up option to Merrill designed to discourage Hanson from seeking control by providing that if any other party (in this case Hanson) should acquire more than one-third of SCM's outstanding shares (66⅔% being needed under N.Y.Bus.L. § 903(a)(2) to effectuate a merger) Merrill would have the right to buy SCM's two most profitable businesses (consumer foods and pigments) at prices characterized by some as "bargain basement." The final act in this scenario was the decision of Hanson, having been deterred by the SCM-Merrill option (colloquially described in the market as a "poison pill"), to terminate its cash tender offer and then to make private purchases, amounting to 25% of SCM's outstanding shares, leading SCM to seek and obtain the preliminary injunction from which this appeal is taken. A more detailed history of relevant events follows.

SCM is a New York corporation with its principal place of business in New York City. Its shares, of which at all relevant times at least 9.9 million were outstanding and 2.3 million were subject to issuance upon conversion of other outstanding securities, are traded on the New York Stock Exchange (NYSE) and Pacific Stock Exchange. Hanson Trust PLC is an English company with its principal place of business in London. HSCM, a Delaware corporation, and Hanson Holdings Netherlands B.V., a Netherlands limited liability company, are indirect wholly-owned subsidiaries of Hanson Trust PLC.

On August 21, 1985, Hanson publicly announced its intention to make a cash tender offer of $60 per share for any and all outstanding SCM shares. Five days later it filed the tender offer documents required by § 14(d)(1) of the Williams Act and regulations issued thereunder. The offer provided that it would remain open until September 23, unless extended, that no shares would be accepted until September 10, and that

"Whether or not the Purchasers [Hanson] purchase Shares pursuant to the Offer, the Purchasers may thereafter determine, subject to the availability of Shares at favorable prices and the availability of financing, to purchase additional Shares in the open market, in privately negotiated transactions, through another tender offer or otherwise. Any such purchases of additional Shares might be on terms which are the same as, or more or less favorable than, those of this Offer. The Purchasers also reserve the right to dispose of any or all Shares acquired by them." *Offer to Purchase For Cash Any and All Outstanding Shares of Common Stock of SCM Corporation* (Aug. 26, 1985) at 21.

On August 30, 1985, SCM, having recommended to SCM's stockholders that they not accept Hanson's tender offer, announced a preliminary agreement with Merrill under which a new entity, formed by SCM and Merrill, would acquire all SCM shares at $70 per share in a leveraged buyout sponsored by Merrill. Under the agreement, which was executed on September 3, the new entity would make a $70 per share cash tender offer for approximately 85% of SCM's shares. If more than two-thirds of SCM's shares were acquired under the offer the remaining SCM shares would be acquired in exchange for debentures in a new corporation to be formed as a result of the merger. On the same date, September 3, Hanson increased its tender offer from $60 to $72 cash per share. However, it expressly reserved the right to terminate its offer if SCM granted to anyone any option to purchase SCM assets on terms that Hanson believed to constitute a "lock-up" device. *Supplement Dated September 5, 1985, to Offer to Purchase,* at 4.

The next development in the escalating bidding contest for control of SCM oc-

curred on September 10, 1985, when SCM entered into a new leveraged buyout agreement with its "White Knight," Merrill. The agreement provided for a two-step acquisition of SCM stock by Merrill at $74 per share. The first proposed step was to be the acquisition of approximately 82% of SCM's outstanding stock for cash. Following a merger (which required acquisition of at least 66⅔%), debentures would be issued for the remaining SCM shares. If any investor or group other than Merrill acquired more than one-third of SCM's outstanding shares, Merrill would have the option to buy SCM's two most profitable businesses, pigments and consumer foods, for $350 and $80 million respectively, prices which Hanson believed to be below their market value.

Hanson, faced with what it considered to be a "poison pill," concluded that even if it increased its cash tender offer to $74 per share it would end up with control of a substantially depleted and damaged company. Accordingly, it announced on the Dow Jones Broad Tape at 12:38 P.M. on September 11 that it was terminating its cash tender offer. A few minutes later, Hanson issued a press release, carried on the Broad Tape, to the effect that "all SCM shares tendered will be promptly returned to the tendering shareholders."

At some time in the late forenoon or early afternoon of September 11 Hanson decided to make cash purchases of a substantial percentage of SCM stock in the open market or through privately negotiated transactions. Under British law Hanson could not acquire more than 49% of SCM's shares in this fashion without obtaining certain clearances, but acquisition of such a large percentage was not necessary to sty-

mie the SCM-Merrill merger proposal. If Hanson could acquire slightly less than one-third of SCM's outstanding shares it would be able to block the $74 per share SCM-Merrill offer of a leveraged buyout. This might induce the latter to work out an agreement with Hanson, something Hanson had unsuccessfully sought on several occasions since its first cash tender offer.

Within a period of two hours on the afternoon of September 11 Hanson made five privately-negotiated cash purchases of SCM stock and one open-market purchase, acquiring 3.1 million shares or 25% of SCM's outstanding stock. The price of SCM stock on the NYSE on September 11 ranged from a high of $73.50 per share to a low of $72.50 per share. Hanson's initial private purchase, 387,700 shares from Mutual Shares, was not solicited by Hanson but by a Mutual Shares official, Michael Price, who, in a conversation with Robert Pirie of Rothschild, Inc., Hanson's financial advisor, on the morning of September 11 (before Hanson had decided to make any private cash purchases), had stated that he was interested in selling Mutual's Shares' SCM stock to Hanson. Once Hanson's decision to buy privately had been made, Pirie took Price up on his offer. The parties negotiated a sale at $73.50 per share after Pirie refused Price's asking prices, first of $75 per share and, later, of $74.50 per share. This transaction, but not the identity of the parties, was automatically reported pursuant to NYSE rules on the NYSE ticker at 3:11 P.M. and reported on the Dow Jones Broad Tape at 3:29 P.M.

Pirie then telephoned Ivan Boesky, an arbitrageur who had a few weeks earlier disclosed in a Schedule 13D statement filed with the SEC [3] that he owned approximate-

**3.** Section 13(d)(1) of the Securities Exchange Act requires any person or group acquiring beneficial ownership of more than 5% of the equity securities of certain issuers to file reports with the SEC. It provides in pertinent part as follows:

"(d)(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title, … is directly or indirectly the beneficial own-

er of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in

ly 12.7% of SCM's outstanding shares. Pirie negotiated a Hanson purchase of these shares at $73.50 per share after rejecting Boesky's initial demand of $74 per share. At the same time Rothschild purchased for Hanson's account 600,000 SCM shares in the open market at $73.50 per share. An attempt by Pirie next to negotiate the cash purchase of another large block of SCM stock (some 780,000 shares) from Slifka & Company fell through because of the latter's inability to make delivery of the shares on September 12.

Following the NYSE ticker and Broad Tape reports of the first two large anonymous transactions in SCM stock, some professional investors surmised that the buyer might be Hanson. Rothschild then received telephone calls from (1) Mr. Mulhearn of Jamie & Co. offering to sell between 200,000 and 350,000 shares at $73.50 per share, (2) David Gottesman, an arbitrageur at Oppenheimer & Co. offering 89,-000 shares at $73.50, and (3) Boyd Jeffries of Jeffries & Co., offering approximately 700,000 to 800,000 shares at $74.00. Pirie purchased the three blocks for Hanson at $73.50 per share. The last of Hanson's cash purchases was completed by 4:35 P.M. on September 11, 1985.

In the early evening of September 11 SCM successfully applied to Judge Kram in the present lawsuit for a restraining order barring Hanson from acquiring more SCM stock for 24 hours. On September 12 and 13 the TRO was extended by consent pending the district court's decision on SCM's application for a preliminary injunction. Judge Kram held an evidentiary hearing on September 12–13, at which various witnesses testified, including Sir Gordon White, Hanson's United States Chairman, two Rothschild representatives (Pirie and Gerald Goldsmith) and stock market risk-arbitrage professionals (Robert Freeman of Goldman, Sachs & Co., Kenneth Miller of Merrill Lynch, and Danial Burch of D.F. King & Co.). Sir Gordon White testified that on September 11, 1985, after learning of the $74 per share SCM-Merrill leveraged buyout tender offer with its "crown jewel" irrevocable "lock-up" option to Merrill, he instructed Pirie to terminate Hanson's $72 per share tender offer, and that only thereafter did he discuss the possibility of Hanson making market purchases of SCM stock. Pirie testified that the question of buying stock may have been discussed in the late forenoon of September 11 and that he had told White that he was having Hanson's New York counsel look into whether

the public interest or for the protection of investors—

"(A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

"(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 78c(a)(6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

"(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any

plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

"(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and

"(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof."

such cash purchases were legally permissible.

SCM argued before Judge Kram (and argues here) that Hanson's cash purchases immediately following its termination of its $72 per share tender offer amounted to a *de facto* continuation of Hanson's tender offer, designed to avoid the strictures of § 14(d) of the Williams Act, and that unless a preliminary injunction issued SCM and its shareholders would be irreparably injured because Hanson would acquire enough shares to defeat the SCM-Merrill offer. Judge Kram found that the relevant underlying facts (which we have outlined) were not in dispute, Memorandum Opinion and Order, at 6 (Sept. 14, 1985), and concluded that "[w]ithout deciding what test should ultimately be applied to determine whether Hanson's conduct constitutes a 'tender offer' within the meaning of the Williams Act ... SCM has demonstrated a likelihood of success on the merits of its contention that Hanson has engaged in a tender offer which violates Section 14(d) of the Williams Act." *Id.* at 7. The district court, characterizing Hanson's stock purchases as "a deliberate attempt to do an 'end run' around the requirements of the Williams Act," *id.* at 8, made no finding on the question of whether Hanson had decided to make the purchases of SCM before or after it dropped its tender offer but concluded that even if the decision had been made after it terminated its offer preliminary injunctive relief should issue. From this decision Hanson appeals.

### DISCUSSION

█ A preliminary injunction will be overturned only when the district court abuses its discretion. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *Application of U.S. In Matter of Order Authorizing the Use of a Pen Register,* 538 F.2d 956, 961 (2d Cir.1976) (All-Writs Act), *rev'd on other grounds sub nom. United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). An abuse of discretion may be found when the district court relies on clearly erroneous findings of fact or on an error of law in issuing the injunction. *See Coca-Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 315–16 (2d Cir.1982); *cf. Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

Since, as the district court correctly noted, the material relevant facts in the present case are not in dispute, this appeal turns on whether the district court erred as a matter of law in holding that when Hanson terminated its offer and immediately thereafter made private purchases of a substantial share of the target company's outstanding stock, the purchases became a "tender offer" within the meaning of § 14(d) of the Williams Act. Absent any express definition of "tender offer" in the Act, the answer requires a brief review of the background and purposes of § 14(d).

Congress adopted § 14(d) in 1968 "in response to the growing use of cash tender offers as a means of achieving corporate takeovers ... which ... removed a substantial number of corporate control contests from the reach of existing disclosure requirements of the federal securities laws." *Piper v. Chris-Craft Industries,* 430 U.S. 1, 22, 97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1977). *See also* S.Rep. No. 550, 90th Cong., 1st Sess., 2–4 (1967) (Senate Report); H.R.Rep. No. 1711, 90th Cong., 2d Sess., 2–4 (1968) (House Report) U.S.Code Cong. & Admin.News 1968, 2811; 114 Cong.Rec. 21483–21484 (July 15, 1968) (Comments of Representatives Springer and Whalen); 113 Cong.Rec. 854–855 (Jan. 18, 1967) (Comments of Senator Williams); *id.* at 24664 (Aug. 30, 1967) (Comments of Senator Williams); *id.* at 24666 (Comments of Senator Javits).

The typical tender offer, as described in the Congressional debates, hearings and reports on the Williams Act, consisted of a general, publicized bid by an individual or group to buy shares of a publicly-owned company, the shares of which were traded on a national securities exchange, at a price substantially above the current market

price. *See* House Report, *supra*, at 2; Senate Report, *supra*, at 2; 113 Cong.Rec. at 855 (Jan. 18, 1967) (Senator Williams); *Takeover Bids: Hearings on H.R. 14475, S. 510 before the Subcommittee on Commerce and Financing of the House Committee on Interstate and Foreign Commerce*, 90th Cong., 2d Sess., 10 (1968) (House Hearings) (Manuel Cohen, Chairman, S.E.C.); *id.* at 44 (Donald Calvin, Vice-President, New York Stock Exchange); *Full Disclosure of Corporate Equity Ownership in Corporate Takeover Bids: Hearings on S. 510 Before the Subcommittee on Securities of the Senate Committee on Banking and Currency*, 90th Cong., 1st Sess. at 2 (1967) (Senate Hearings) (Senator Williams); *id.* at 17 (Manuel Cohen); *id.* at 42 (Senator Kuchel). The offer was usually accompanied by newspaper and other publicity, a time limit for tender of shares in response to it, and a provision fixing a quantity limit on the total number of shares of the target company that would be purchased.

Prior to the Williams Act a tender offeror had no obligation to disclose any information to shareholders when making a bid. The Report of the Senate Committee on Banking and Currency aptly described the situation: "by using a cash tender offer the person seeking control can operate in almost complete secrecy. At present, the law does not even require that he disclose his identity, the source of his funds, who his associates are, or what he intends to do if he gains control of the corporation." Senate Report, *supra*, at 2. *See also* House Report, *supra*, at 2, U.S.Code Cong. & Admin.News 1968, at 2812. The average shareholder, pressured by the fact that the tender offer would be available for only a short time and restricted to a limited number of shares, was forced "with severely limited information, [to] decide what course of action he should take." *Id.* at 2, U.S. Code Cong. & Admin.News 1968, at 2812. "Without knowledge of who the bidder is and what he plans to do, the shareholder cannot reach an informed decision. He is forced to take a chance. For no matter what he does, he does it without adequate informa-tion to enable him to decide rationally what is the best possible course of action." *Id.* at 2, U.S.Code Cong. & Admin.News 1968, at 2812; Senate Report, *supra*, at 2.

■ The purpose of the Williams Act was, accordingly, to protect the shareholders from that dilemma by insuring "that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information." *Piper v. Chris-Craft Industries*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977); *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975).

Congress took "extreme care," 113 Cong. Rec. 24664 (Senator Williams); *id.* at 854 (Senator Williams), however, when protecting shareholders, to avoid "tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid." House Report, *supra*, at 4, U.S.Code Cong. & Admin.News 1968, at 2813; Senator Report, *supra*, at 4. Indeed, the initial draft of the bill, proposed in 1965, had been designed to prevent "proud old companies [from being] reduced to corporate shells after white-collar pirates have seized control," 111 Cong.Rec. 28257 (Oct.. 22, 1965) (Senator Williams). Williams withdrew that draft following claims that it was too biased in favor of incumbent management. Tyson & August, "The Williams Act After RICO: Has the Balance Tipped in Favor of Incumbent Management?" 33 Hastings L.J. 53, 61 (1983). In the end, Congress considered it crucial that the act be neutral and place " 'investors on an equal footing with the takeover bidder' ... without favoring either the tender offeror or existing management." *Piper*, *supra*, 430 U.S. at 30, 97 S.Ct. at 943 (quoting Senate Report, *supra*, at 4). *See also Rondeau*, *supra*, 422 U.S. at 58 n. 8, 95 S.Ct. at 2076 n. 8; *Edgar v. MITE Corp.*, 457 U.S. 624, 633, 102 S.Ct. 2629, 2636, 73 L.Ed.2d 269 (1982).

Congress finally settled upon a statute requiring a tender offer solicitor seeking beneficial ownership of more than 5% of

the outstanding shares of any class of any equity security registered on a national securities exchange first to file with the SEC a statement containing certain information specified in § 13(d)(1) of the Act, as amplified by SEC rules and regulations. Congress' failure to define "tender offer" was deliberate. Aware of "the almost infinite variety in the terms of most tender offers" and concerned that a rigid definition would be evaded, Congress left to the court and the SEC the flexibility to define the term. House Hearings, *supra,* at 18 (Manuel Cohen, S.E.C. Chairman). *See also* Letter from Senators Proxmire, Sarbanes and Williams to Harold M. Williams, Chairman of the S.E.C. (July 3, 1979) *reprinted in* Securities and Exchange Commission Report on Tender Offer Laws, printed for the use of the Senate Committee on Banking, Housing and Urban Affairs 3 (Comm.Print 1980); *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 598 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).

Although § 14(d)(1) clearly applies to "classic" tender offers of the type described above (pp. 54–55), courts soon recognized that in the case of privately negotiated transactions or solicitations for private purchases of stock many of the conditions leading to the enactment of § 14(d) for the most part do not exist. The number and percentage of stockholders are usually far less than those involved in public offers. The solicitation involves less publicity than a public tender offer or none. The solicitees, who are frequently directors, officers or substantial stockholders of the target, are more apt to be sophisticated, inquiring or knowledgeable concerning the target's business, the solicitor's objectives, and the impact of the solicitation on the target's business prospects. In short, the solicitee in the private transaction is less likely to be pressured, confused, or ill-informed regarding the businesses and decisions at stake than solicitees who are the subjects of a public tender offer.

These differences between public and private securities transactions have led most courts to rule that private transactions or open market purchases do not qualify as a "tender offer" requiring the purchaser to meet the pre-filing strictures of § 14(d). *Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 449 F.Supp. 951, 961 (S.D.N.Y.), *aff'd in relevant part,* 584 F.2d 1195, 1206–07 (2d Cir.1978); *Stromfeld v. Great Atlantic & Pac. Tea Co., Inc.,* 496 F.Supp. 1084, 1088–89 (S.D.N.Y.), *aff'd mem.,* 646 F.2d 563 (2d Cir.1980); *SEC v. Carter-Hawley Hale Stores, Inc.,* 760 F.2d 945, 950–53 (9th Cir.1985); *Brascan Ltd. v. Edper Equities, Ltd.,* 477 F.Supp. 773, 791–92 (S.D.N.Y.1979); *Astronics Corp. v. Protective Closures Co.,* 561 F.Supp. 329, 334 (W.D.N.Y.1983); *LTV Corp. v. Grumman Corp.,* 526 F.Supp. 106, 109 (E.D.N.Y. 1981); *Energy Ventures, Inc. v. Appalachian Co.,* 587 F.Supp. 734, 739–41 (D.Del. 1984); *Ludlow v. Tyco Laboratories, Inc.,* 529 F.Supp. 62, 67 (D.Mass.1981); *Chromalloy American Corp. v. Sun Chemical Corp.,* 474 F.Supp. 1341, 1346–47 (E.D. Mo.), *aff'd,* 611 F.2d 240 (8th Cir.1979). The borderline between public solicitations and privately negotiated stock purchases is not bright and it is frequently difficult to determine whether transactions falling close to the line or in a type of "no man's land" are "tender offers" or private deals. This has led some to advocate a broader interpretation of the term "tender offer" than that followed by us in *Kennecott Copper Corp. v. Curtiss-Wright Corp., supra,* 584 F.2d at 1207, and to adopt the eight-factor "test" of what is a tender offer, which was recommended by the SEC and applied by the district court in *Wellman v. Dickinson,* 475 F.Supp. 783, 823–24 (S.D.N.Y.1979), *aff'd on other grounds,* 682 F.2d 355 (2d Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983), and by the Ninth Circuit in *SEC v. Carter Hawley Hale Stores, Inc., supra.* The eight factors are:

"(1) active and widespread solicitation of public shareholders for the shares of an issuer;

(2) solicitation made for a substantial percentage of the issuer's stock;

(3) offer to purchase made at a premium over the prevailing market price;

(4) terms of the offer are firm rather than negotiable;

(5) offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased;

(6) offer open only for a limited period of time;

(7) offeree subjected to pressure to sell his stock;

.     .     .     .     .

[ (8) ] public announcements of a purchasing program concerning the target company precede or accompany rapid accumulation of large amounts of the target company's securities." (475 F.Supp. at 823–24).

Although many of the above-listed factors are relevant for purposes of determining whether a given solicitation amounts to a tender offer, the elevation of such a list to a mandatory "litmus test" appears to be both unwise and unnecessary. As even the advocates of the proposed test recognize, in any given case a solicitation may constitute a tender offer even though some of the eight factors are absent or, when many factors are present, the solicitation may nevertheless not amount to a tender offer because the missing factors outweigh those present. *Id.*, at 824; *Carter, supra,* at 950.

■■■ We prefer to be guided by the principle followed by the Supreme Court in deciding what transactions fall within the private offering exemption provided by § 4(1) of the Securities Act of 1933, and by ourselves in *Kennecott Copper* in determining whether the Williams Act applies to private transactions. That principle is simply to look to the statutory purpose. In *S.E.C. v. Ralston Purina Co.,* 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), the Court stated, "the applicability of § 4(1) should turn on whether the particular class of persons affected need the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'" *Id.,* at 125, 73 S.Ct. at 984. Similarly, since the purpose of § 14(d) is to protect the ill-informed solicitee, the question of whether a solicitation constitutes a "tender offer" within the meaning of § 14(d) turns on whether, viewing the transaction in the light of the totality of circumstances, there appears to be a likelihood that unless the pre-acquisition filing strictures of that statute are followed there will be a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them.

■■■ Applying this standard, we are persuaded on the undisputed facts that Hanson's September 11 negotiation of five private purchases and one open market purchase of SCM shares, totalling 25% of SCM's outstanding stock, did not under the circumstances constitute a "tender offer" within the meaning of the Williams Act. Putting aside for the moment the events preceding the purchases, there can be little doubt that the privately negotiated purchases would not, standing alone, qualify as a tender offer, for the following reasons:

(1) In a market of 22,800 SCM shareholders the number of SCM sellers here involved, six in all, was miniscule compared with the numbers involved in public solicitations of the type against which the Act was directed.

(2) At least five of the sellers were highly sophisticated professionals, knowledgeable in the market place and well aware of the essential facts needed to exercise their professional skills and to appraise Hanson's offer, including its financial condition as well as that of SCM, the likelihood that the purchases might block the SCM-Merrill bid, and the risk that if Hanson acquired more than 33⅓% of SCM's stock the SCM-Merrill lockup of the "crown jewel" might be triggered. Indeed, by September 11 they had all had access to (1) Hanson's 27-page detailed disclosure of facts, filed on August 26, 1985, in accordance with § 14(d)(1) with

respect to its $60 tender offer, (2) Hanson's 4-page amendment of that offer, dated September 5, 1985, increasing the price to $72 per share, and (3) press releases regarding the basic terms of the SCM-Merrill proposed leveraged buyout at $74 per share and of the SCM-Merrill asset option agreement under which SCM granted to Merrill the irrevocable right under certain conditions to buy SCM's consumer food business for $80 million and its pigment business for $350 million.

(3) The sellers were not "pressured" to sell their shares by any conduct that the Williams Act was designed to alleviate, but by the forces of the market place. Indeed, in the case of Mutual Shares there was no initial solicitation by Hanson; the offer to sell was initiated by Mr. Price of Mutual Shares. Although each of the Hanson purchases was made for $73.50 per share, in most instances this price was the result of private negotiations after the sellers sought higher prices and in one case price protection, demands which were refused. The $73.50 price was not fixed in advance by Hanson. Moreover, the sellers remained free to accept the $74 per share tender offer made by the SCM-Merrill group.

(4) There was no active or widespread advance publicity or public solicitation, which is one of the earmarks of a conventional tender offer. Arbitrageurs might conclude from ticker tape reports of two large anonymous transactions that Hanson must be the buyer. However, liability for solicitation may not be predicated upon disclosures mandated by Stock Exchange Rules. See *S.E.C. v. Carter-Hawley Hale Stores, Inc., supra,* 760 F.2d at 950.

(5) The price received by the six sellers, $73.50 per share, unlike that appearing in most tender offers, can scarcely be dignified with the label "premium." The stock market price on September 11 ranged from $72.50 to $73.50 per share. Although risk arbitrageurs sitting on large holdings might reap sizeable profits from sales to Hanson at $73.50, depending on their own purchase costs, they stood to gain even more if the SCM-Merrill offer of $74 should succeed, as it apparently would if they tendered their shares to it. Indeed, the $73.50 price, being at most $1 over market or 1.4% higher than the market price, did not meet the SEC's proposed definition of a premium, which is $2.00 per share or 5% above market price, whichever is greater. SEC Exchange Act Release No. 16,385 (11/29/79) [1979–80] Fed.Sec.L.Rep. ¶ 82,374.

(6) Unlike most tender offers, the purchases were not made contingent upon Hanson's acquiring a fixed minimum number or percentage of SCM's outstanding shares. Once an agreement with each individual seller was reached, Hanson was obligated to buy, regardless what total percentage of stock it might acquire. Indeed, it does not appear that Hanson had fixed in its mind a firm limit on the amount of SCM shares it was willing to buy.

(7) Unlike most tender offers, there was no general time limit within which Hanson would make purchases of SCM stock. Concededly, cash transactions are normally immediate but, assuming an inability on the part of a seller and Hanson to agree at once on a price, nothing prevented a resumption of negotiations by each of the parties except the arbitrageurs' speculation that once Hanson acquired 33⅓% or an amount just short of that figure it would stop buying.

In short, the totality of circumstances that existed on September 11 did not evidence any likelihood that unless Hanson was required to comply with § 14(d)(1)'s pre-acquisition filing and waiting-period requirements there would be a substantial risk of ill-considered sales of SCM stock by ill-informed shareholders.

■ There remains the question whether Hanson's private purchases take on a different hue, requiring them to be treated as a *"de facto"* continuation of its earlier tender offer, when considered in the context of Hanson's earlier acknowledged

tender offer, the competing offer of SCM-Merrill and Hanson's termination of its tender offer. After reviewing all of the undisputed facts we conclude that the district court erred in so holding.

In the first place, we find no record support for the contention by SCM that Hanson's September 11 termination of its outstanding tender offer was false, fraudulent or ineffective. Hanson's termination notice was clear, unequivocal and straightforward. Directions were given, and presumably are being followed, to return all of the tendered shares to the SCM shareholders who tendered them. Hanson also filed with the SEC a statement pursuant to § 14(d)(1) of the Williams Act terminating its tender offer. As a result, at the time when Hanson made its September 11 private purchases of SCM stock it owned no SCM stock other than those shares revealed in its § 14(d) pre-acquisition report filed with the SEC on August 26, 1985.

The reason for Hanson's termination of its tender offer is not disputed: in view of SCM's grant of what Hanson conceived to be a "poison pill" lock-up option to Merrill, Hanson, if it acquired control of SCM, would have a company denuded as the result of its sale of its consumer food and pigment businesses to Merrill at what Hanson believed to be bargain prices. Thus, Hanson's termination of its tender offer was final; there was no tender offer to be "continued." Hanson was unlikely to "shoot itself in the foot" by triggering what it believed to be a "poison pill," and it could not acquire more than 49% of SCM's shares without violating the rules of the London Stock Exchange.

Nor does the record support SCM's contention that Hanson had decided, before terminating its tender offer, to engage in cash purchases. Judge Kram referred only to evidence that "Hanson had *considered* open market purchases before it announced that the tender offer was dropped" (emphasis added) but made no finding to that effect. Absent evidence or a finding that Hanson had decided to seek control of SCM through purchases of its stock, no duty of

disclosure existed under the federal securities laws.

Second, Hanson had expressly reserved the right in its August 26, 1985, pre-acquisition tender offer filing papers, whether or not tendered shares were purchased, *"thereafter ... to purchase additional Shares in the open market, in privately negotiated transactions, through another tender offer or otherwise."* (Emphasis added). See p. 46, *supra.* Thus, Hanson's privately negotiated purchases could hardly have taken the market by surprise. Indeed, professional arbitrageurs and market experts rapidly concluded that it was Hanson which was making the post-termination purchases.

Last, Hanson's prior disclosures of essential facts about itself and SCM in the pre-acquisition papers it filed on August 26, 1985, with the SEC pursuant to § 14(d)(1), are wholly inconsistent with the district court's characterization of Hanson's later private purchases as "a deliberate attempt to do an 'end run' around the requirements of the Williams Act." On the contrary, the record shows that Hanson had already filed with the SEC and made public substantially the same information as SCM contends that Hanson should have filed before making the cash purchases. The term "tender offer," although left somewhat flexible by Congress' decision not to define it, nevertheless remains a word of art. Section 14(d)(1) was never intended to apply to *every* acquisition of more than 5% of a public company's stock. If that were the case there would be no need for § 13(d)(1), which requires a person, *after* acquiring more than 5%, to furnish the issuer, stock exchange and the SEC with certain pertinent information. Yet the expansive definition of "tender offer" advocated by SCM, and to some extent by the SEC as amicus, would go far toward rendering § 13(d)(1) a dead letter. In the present case, we were advised by Hanson's counsel upon argument on September 23 that on that date it was filing with the SEC the information required by § 13(d)(1) of the Williams Act with respect to its private purchases of

SCM stock. In our view this is all that is required by the Act in the present circumstances.

■ It may well be that Hanson's private acquisition of 25% of SCM's shares after termination of Hanson's tender offer was designed to block the SCM-Merrill leveraged buyout group from acquiring the 66⅔% of SCM's stock needed to effectuate a merger. It may be speculated that such a blocking move might induce SCM to buy Hanson's 25% at a premium or lead to negotiations between the parties designed to resolve their differences. But we know of no provision in the federal securities laws or elsewhere that prohibits such tactics in "hardball" market battles of the type encountered here. *See Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357, 378–79 (2d Cir.1980) ("We also see nothing wrong in Care's efforts to acquire one third of Treadway's outstanding stock, and thus to obtain a 'blocking position'.").

Thus the full disclosure purposes of the Williams Act as it now stands appear to have been fully satisfied by Hanson's furnishing to the public, both before and after termination of its tender offer, all of the essential relevant facts it was required by law to supply.

■ SCM further contends, and in this respect it is supported by the SEC as an amicus, that upon termination of a tender offer the solicitor should be subject to a waiting or cooling-off period (10 days is suggested) before it may purchase any of the target company's outstanding shares. However, neither the Act nor any SEC rule promulgated thereunder prohibits a former tender offeror from purchasing stock of a target through privately negotiated transactions immediately after a tender offer has been terminated. Indeed, it is significant that the SEC's formal proposal for the adoption of such a rule (Proposed Rule 14e–5) has never been implemented even though the SEC adopted a similar prohibition with respect to an *issuer's* making such purchases within 10 days after termination of a tender offer. *See* Rule 13e–4(f)(6). Thus, the existing law does not

support the prohibition urged by SCM and the SEC. We believe it would be unwise for courts judicially to usurp what is a legislative or regulatory function by substituting our judgment for that of Congress or the SEC.

■ In recognition of Congress' desire in enacting the Williams Act to avoid favoring either existing corporate management or outsiders seeking control through tender offers (*see* pp. 55–56, *supra*), the role of the courts in construing and applying the Act must likewise be one of strict neutrality. *Rondeau v. Mosinee Paper Corp., supra,* 422 U.S. at 58–59, 95 S.Ct. at 2075–76. Although we should not hesitate to enforce the Act's disclosure provisions through appropriate relief, we must also guard against improvident or precipitous use of remedies that may have the effect of favoring one side or the other in a takeover battle when allegations of violation of the Act, often made in the heat of the contest, may not be substantiated. In this context the preliminary injunction, which is one of the most drastic tools in the arsenal of judicial remedies, *Medical Soc. of State of N.Y. v. Toia,* 560 F.2d 535, 537 (2d Cir.1977) ("an extraordinary and drastic remedy which should not be routinely granted"), must be used with great care, lest the forces of the free market place, which in the end should determine the merits of takeover disputes, are nullified.

In the present case we conclude that since the district court erred in ruling as a matter of law that SCM had demonstrated a likelihood of success on the merits, based on the theory that Hanson's post-tender offer private purchases of SCM constituted a *de facto* tender offer, it was an abuse of discretion to issue a preliminary injunction. Indeed, we do not believe that Hanson's transactions raise serious questions going to the merits that would provide a fair ground for litigation. In view of this holding it becomes unnecessary to rule upon the district court's determination that the balance of hardships tip in favor of SCM and that absent preliminary relief it would suffer irreparable injury. However, our

decision is not to be construed as an affirmance of the district court's resolution of these issues.

■ SCM and its stockholders may well have an adequate remedy at law. No other SCM stockholder is prevented by Hanson's acquisitions from tendering stock in response to the SCM-Merrill offer for purchase at $74 per share. Assuming that Hanson's purchases were ultimately found to violate the Williams Act, SCM stockholders deprived of their ability to realize $74 per share under the SCM-Merrill offer could recover money damages for the losses they suffered. *See Rondeau v. Mosinee Paper Corp., supra,* 422 U.S. at 61, 95 S.Ct. at 2077. Furthermore, an order requiring Hanson to rescind its purchases is within the scope of relief courts may grant. *J.I. Case v. Borak,* 377 U.S. 426, 433–34, 84 S.Ct. 1555, 1560–61, 12 L.Ed.2d 423 (1964). Finally, there is no evidence that any other "White Knights" or independent bidders for control of SCM stood in the wings and might have joined the bidding fray except for Hanson's purchases. On the contrary, the SCM-Merrill tender offer states that Goldman Sachs "held discussions with several potential purchasers of the Company [SCM]" but that, although interest was expressed in acquiring one or more of SCM's businesses, "no firm proposals were made or prices discussed ... for the Company as a whole, other than the proposal [by Merrill] for the leveraged buyout of the Company described below."

The order of the district court is reversed, the preliminary injunction against Hanson is vacated, and the case is remanded for further proceedings in accordance with this opinion. The mandate shall issue forthwith.