**MAYNARD OIL COMPANY, Plaintiff,**

v.

**DELTEC PANAMERICA S.A., et al., Defendants.**

No. 85 Civ. 8126 (CSH).

United States District Court,
S.D. New York.

Oct. 18, 1985.

Fried, Frank, Harris, Shriver & Jacobson, Leon Silverman, Stephen D. Alexander, Bijan Amini, New York City, for plaintiff.

Gibson, Dunn & Crutcher, Walter Stratton, Lee Spencer, Mitchell A. Karlan, New York City, for defendants.

HAIGHT, District Judge.

This litigation arises under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, by the Williams Act and accompanying regulations.

On October 9th, 1985, the defendant and counterclaim-plaintiff, Avalon Corporation, publicly announced a tender offer for all outstanding shares of the common stock of plaintiff and counterclaim-defendant, Maynard Oil Company. The offering price was $6.00 a share.

The offer was specifically conditioned, among other things, upon the valid tender without withdrawal prior to the November 7th 1985 expiration date of 3.2 million shares, which number of shares together with the shares already owned by Avalon, would approximately equal 51 percent of Maynard Oil's total outstanding shares and the shares issuable upon exercise of outstanding stock options and upon conversion of the company's convertible debentures.

The expiration date of the offer is at midnight Eastern Standard Time, Thursday, November 7, 1985, unless extended. Withdrawal rights expire at midnight Eastern Standard Time on Thursday October 31, 1985.

The board of directors of Maynard regarded and regard Avalon's offer with disfavor. At 8:30 p.m. on October 15, Maynard issued a press release which was quoted on the broad tape on October 16, and referred to by leading newspapers of this city on October 17. The press release commences with an announcement by the Maynard board of directors that the board did not favor the Avalon offer, viewed it as inadequate and not in the best interests of the company or its stockholders. And after dealing with that subject, on page 2 of the press release, the following appears:

"Maynard Oil Company also announced that the board of directors has authorized the purchase of up to 1.3 million shares of the company's common stock in open market or privately negotiated transactions. The board of directors has authorized the expenditure of up to $8 million for the purchase program. Maynard Oil said that the purpose of the purchase is to defeat the tender offer by Avalon Corporation, and to afford some stockholders who wished to sell shares at this time, an opportunity to do so, while allowing other stockholders wishing to retain their investment in the company under present management, to do so.

"Smith Barney will act as the company's agent for the purchase of shares. Maynard Oil intends to finance the purchases, along with its working capital needs, with internally generated funds, borrowings from banks, affiliates or others, or refinancing of existing indebtedness. In further action, the company has filed a lawsuit against Avalon Corporation and its affiliates alleging violation of the Federal Securities Laws in connection with Avalon's tender offer and Avalon's affiliates' prior purchases of Maynard stock. The suit filed in Federal Court in New York seeks to have the

Avalon tender offer restrained and other relief."

The suit referred to in the last paragraph of the press release was filed on October 16, and was assigned to me. On October 17, Avalon filed a counterclaim against Maynard. Avalon accompanied that counterclaim with a motion for a temporary restraining order brought on by order to show cause.

Maynard was directed to show cause why a temporary restraining order should not issue herein, enjoining counterclaim defendants pending a hearing and determination of Avalon's motion for a preliminary injunction from purchasing, agreeing to purchase, or acquiring any interest in any shares or equivalents thereof of defendant Maynard Oil Company.

Counsel for Avalon appeared before me ex parte at 8:30 a.m. on October 17. The circumstances of that appearance and the action then taken I described in detail at the conclusion of the hearing held yesterday afternoon. It is sufficient for the present to say that at the conclusion of the ex parte hearing, I signed a temporary restraining order which provides, in pertinent part:

"It is further ordered that counterclaim defendants and each of them and their directors, officers, employees, agents, subsidiaries and affiliates, and all other persons acting in concert with or on behalf of counterclaim defendants directly or indirectly, are restrained and enjoined from purchasing, agreeing to purchase, or otherwise acquiring any interest in any shares or equivalents thereof of Maynard Oil until such time as the parties may be heard on Avalon's application for a temporary restraining order as set forth in this order to show cause and restraining order."

The motion for continuance of the temporary restraining order was made returnable at 1 p.m. on October 17. Counsel for the parties appeared and argued the case at length. Avalon presses for continuance of the restraint during that 10 day period contemplated by Rule 65, Fed.R.Civ.P., during which time expedited discovery would pave the way for Avalon's contemplated motion for a preliminary injunction. Maynard asks that the restraint be lifted.

Avalon's counterclaim asserts three causes of action against Maynard. The first alleges violation of Rule 13e–4, 17 C.F.R. § 240.13(e)–4, promulgated by the Securities and Exchange Commission. That cause of action is based upon the premise that Maynard's recent activities in respect of this stock should be characterized as an issuer tender offer. Avalon's second cause of action alleges violation of Rule 13e–3, 17 C.F.R. § 240.13(e)–3. It is based on the premise that the effect of Maynard's recent utterances is to bring about a reasonable likelihood of the company going private.

There is a third cause of action for breach of fiduciary duties. This is a pendent common law claim, and under familiar principles its fortunes rise or fall on the basis of the resolution of the federal claims. If either characterization under federal law is warranted by the facts in the law, Maynard is obligated to make public filings and disclosures, which Maynard concededly has not made. Maynard has not made these filings because in its view its activities do not fall within Rules 13e–4 or 13e–3.

However, Maynard both concedes and proclaims that its activities fall within Rule 13e–1, 17 C.F.R. § 240.13(e)–1, which deals generally with the purchase of securities by the issuer thereof. It is common ground that Maynard has filed with the SEC the transaction statement required by Rule 13e–1. That statement reads as follows:

"One, this Rule 13e–1 transaction statement relates to proposed purchases by Maynard Oil Company, a Delaware corporation, the company, of shares of common stock of par value, $0.10 per share, of the company, the common stock. Purchases by the company may be effected by open market or privately negotiated transactions. Any such open market purchase transaction may be ef-

fected in the over-the-counter market or otherwise. The company may purchase up to 1.3 million shares of the company's common stock. However, there can be no assurance that all such purchases will be made.

"Two, the company is purchasing common stock to defeat the tender offer by Avalon Corporation for all of the common stock of the company as described in the schedule 14(d) 1 filed on October 10, 1985. The board of directors of the company has determined that the unsolicited tender offer by Avalon is inadequate and not in the best interests of the company or its stockholders. The proposed purchases of common stock by the company will afford some stockholders who wish to sell their shares at this time an opportunity to do so, and will allow other stockholders who wish to continue their investment in the company under present management, to do so.

"The common stock acquired by the company will be held as treasury stock or retired.

"Three, the board of directors of the company has unanimously authorized the expenditure of up to $8 million to purchase shares of the company's common stock. The company intends to finance the purchases, along with its working capital needs, with internally generated funds, borrowings from banks, affiliates or others, or refinancing of existing indebtedness."

I do not understand Avalon to contest the adequacy of Maynard's Rule 13e–1 statement, but Mr. Stratton argues forcefully that Maynard's compliance with Rule 13e–1 does not relieve it of filing and disclosure obligations that arise under Rules 13e–3 and 13e–4.

■ I am not certain that Mr. Silverman really argues that the necessary effect of a Rule 13e–1 filing in all circumstances is to relieve an issuer of Rule 13e–3 or 13e–4 filings. If Mr. Silverman is not saying that, then Mr. Stratton is attacking a straw man and not Mr. Silverman. But if that is, in fact, Mr. Silverman's submission,

I cannot accept it. The subdivisions of the rule are not mutually exclusive. Rule 13e–1 deals generally with an issuer's purchase of its shares. The issuer's activities may in the totality of circumstances have the effect of taking the company private as defined in Rule 13e–3, or they may not. The activities may constitute a tender offer as defined in Rule 13e–4, or they may not.

■ If they do not, the Rule 13e–1 filing suffices. If they do, it does not. One must, therefore, consider the substance of Avalon's allegations under the securities laws. The necessity for a Rule 13e–3 filing is triggered by circumstances which bring about either of the following effects:

(A) Causing any class of equity securities of the issuer which is subject to section 12(g) or section 15(d) of the Act to be held of record by less than 300 persons; or

(B) Causing any class of equity securities of the issuer which is either listed on a national securities exchange or authorized to be quoted in an inter-dealer quotation system of a registered national securities association to be neither listed on any national securities exchange nor authorized to be quoted on an inter-dealer quotation system of any registered national securities association.

■ 17 C.F.R. § 240.13(e)–3(a)(3)(ii). In the case at bar, Avalon's principal argument is that there is a reasonable likelihood that Maynard's purchases, if permitted to proceed, will result in the company's shares being held by less than 300 persons. It is common ground that to achieve that result, the holdings and future purchases of Avalon, Maynard's adversary, must be included. But I conclude that an adversary's holdings cannot be included in the calculation.

There are several reasons why in my judgment that is so. Much has been said about the SEC's Release No. 34–17719, 46 Fed.Reg. 22,571 (1981), which addresses these issues. The release focuses upon the problem of "overreaching of unaffiliated security holders by an issuer or its affil-

iates." However, on the facts of this case, no risk of Maynard overreaching Avalon can fairly be said to arise. If Avalon's construction is accepted, Avalon controls not only its own destiny, but, by its purchases of Maynard stock, whether or not Maynard goes private.

But it seems to me fanciful to suggest that the filing requirements of Rule 13e–3 may be forced upon an issuer as the result of the purchases of an adversary whose actions the issuer cannot control. I appreciate that at one point in the SEC release, it is said: "In the absence of a purpose of producing or facilitating the production of any of the specified effects, the determination of whether a transaction or a series of transactions is likely to produce any of such effects, must take into account past, current, and planned transactions by the issuer, its affiliates and others, as well as other factors which may contribute to the production of such effects."

This is the one place in the publication where the word "affiliates" is accompanied by the somewhat imprecise phrase "and others." Mr. Stratton submits that "and others" includes an adversary like Avalon. A literal reading of the phrase in isolation lends some support to the argument. However, considering the phrase in context, both of the release and the statutory and regulatory scheme, I find myself in agreement with Mr. Silverman that the phrase should be read to mean others acting in concert with the issuer and its affiliates. And I will add to Mr. Silverman's submission, that the phrase may properly be construed to mean, in addition to that, others acting independently of the adversary.

Avalon's construction would do violence to, or is at least inconsistent with, Rule 13e–1. Rule 13e–1 specifically contemplates that an issuer may, confronted by an adverse tender offer, purchase its own shares. Under Avalon's theory, once the issuer does so, the adversary may throw the issuer into a Rule 13e–3 posture by offering to buy all the shares and then proclaim a reasonable likelihood of less

than 300 shareholders. There is an element of bootstrap about the construction which I find that I cannot accept.

Furthermore, on the facts of this case, the "reasonable likelihood" element is significantly undermind by the terms of Avalon's tender offer. As noted, Avalon's offer is conditioned upon its obtaining 51 percent of Maynard's shares. To the extent that Maynard's purchasing program succeeds, Avalon's prospects of obtaining 51 percent of the shares falls in direct proportion. I may judicially notice that it is impossible for both Maynard and Avalon to acquire 51 percent of the shares.

In consequence, circumstances may arise in which Avalon would be required to amend its tender offer to "an any and all" basis if the going private likelihood or, indeed, the possibility is to remain. It is not clear on the present record that Avalon would do so. In short, I find no substance to Avalon's Rule 13e–3 claim.

■ That brings me to the 13e–4 claim. The question that arises is whether or not Maynard's activities may fairly be regarded as an issuer tender offer. I begin with the Second Circuit's decision in *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2nd Cir.1985). *Hanson* recommits the Second Circuit to that concept of a tender offer which it expressed in *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195 (2nd Cir.1978), 774 F.2d at 57. In *Kennecott*, the Court said: "Although the Williams act does not define the term tender offer, the characteristics of the typical offer are well-recognized. They are described in the House Report of the committee on Interstate and Foreign Commerce which held hearings on the proposed act." 584 F.2d at 1206.

And then the Court quotes from that report: "The offer normally consists of a bid by an individual or group to buy shares of the company, usually at a price above the current market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a speci-

fied portion of the tendered shares if certain specified conditions are met." *Id.*

In *Kennecott* and later in *Hanson,* the Second Circuit has rejected broader, and one may say perhaps more flexible, interpretations other courts have adopted in respect of what constitutes an issuer tender offer. In my view, Maynard's declarations as contained in its Rule 13e–1 statement and press release cannot fairly be characterized as a tender offer solicitation within these criteria. No particular price is specified. The Rule 13e–1 statement contains the express reservation that "there can be no assurance that all such purchases will be made." That reservation is implicit, it seems to me, in the press release. Surely it cannot be said that Maynard by the statements is obligating itself to do anything.

Furthermore, the Rule 13e–1 statement was required by the SEC rule, and as the *Hanson* Court said: "liability for solicitation may not be predicated upon disclosures mandated by stock exchange rules." The same rational 774 F.2d at 58 (citing *S.E.C. v. Carter Hawley-Hale Stores, Inc.,* 760 F.2d 945, 950 (9th Cir.1985) applies, of course, to statements mandated by SEC rules, as the *Carter Hawley-Hales Stores* case cited in *Hanson* holds.

It is not entirely clear that in this case Maynard's press release was mandated by the authorities as the press release was so required in *Crane Co. v. Harsco Corp.,* 511 F.Supp. 294 (D.Del.1981), upon which Maynard relies. Judge Wright in that case stated, "On February 26th, at the request of the New York Stock Exchange, Horskoe issued a press release describing the transaction." *Id.* at 298. But even accepting that Maynard's press release was not mandated, the 13e–1 statement was, and the statements are substantially the same.

█ There is a passage in Judge Mansfield's opinion in *Hanson* to which district judges must give close attention. It reads as follows: "In recognition of Congress's desire in enacting the Williams Act to avoid favoring either existing corporate management or outsiders seeking control through tender offers, the role of the courts in construing and applying the act must likewise be one of strict neutrality.

"Although we should not hesitate to enforce the act's disclosure provisions through appropriate relief, we must also guard against improvident or precipitous use of remedies that may have the effect of favoring one side or the other in a takeover battle when allegations of violation of the act often made in the heat of the contest, may not be substantial. In this context, the preliminary injunction, which is one of the most drastic tools in the arsenal of judicial remedies, must be used with great care, lest the forces of the free marketplace, which in the end should determine the merits of takeover disputes, are nullified." 774 F.2d at 60 (citations omitted).

One way in which district judges should manifest the requisite great care is to require of a party, such as Avalon, a strong showing that its adversary is in violation of applicable SEC rules. For the reasons stated, I conclude that no such showing has been made in the case at bar, and I am not prepared to hold things in place while discovery even on an expedited basis goes on in order to permit an effort to flesh out the allegations in the pleadings.

It seems to me on the basis of the record, the pleadings and the pertinent law, that the theories of Federal securities violation put forward by Avalon in this case do not rise to a sufficient level to permit even so limited a temporary restraint.

Because that is so, I need not, any more than did the Court of Appeals in *Hanson, see* 774 F.2d at 60, 61, consider at length the question of irreparable harm.

I hold, in consequence, that the temporary restraining order was improvidently granted, it is hereby vacated.