ASTRONICS CORPORATION, Mason C. Winfield, Jr., Plaintiffs,

v.

PROTECTIVE CLOSURES CO., INC.; Mark IV Industries, Inc.; Charles Percival and Neil R. Farmelo, Individually and as President and Secretary, respectively, of Protective Closures Co., Inc., and as Trustees of a certain Trust of Stock in Protective Closures Co., Inc., for the benefit of Mason Winfield, Jr., and others; and R.C. Winfield, as Trustee of a certain Trust of Stock in Protective Closures Co., Inc., for the benefit of Mason C. Winfield, Jr., and others; and Manufacturers Hanover, N.A., Defendants.

No. CIV–83–13C.

United States District Court, W.D. New York.

April 4, 1983.

Moot & Sprague, Buffalo, N.Y. (Richard F. Griffin, Buffalo, N.Y., of counsel), for plaintiffs.

Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N.Y. (Robert B. Conklin, and David A. Garbus, Buffalo, N.Y., of counsel), for defendants.

## AMENDED DECISION and ORDER

CURTIN, Chief Judge.

Pending before the court is the application of Astronics Corporation for a preliminary injunction. On January 5, 1983, the court heard extensive argument and denied plaintiffs' motion for a preliminary injunction. At the request of the plaintiffs and pursuant to Rule 62(c) of the Federal Rules of Civil Procedure, the court provided a temporary stay until 12 p.m. on Friday, January 7, 1983, in order to give plaintiffs an opportunity to make application to the United States Court of Appeals.

Because of the shortness of time, the facts in this matter may only be briefly sketched by the court.

Both plaintiff Astronics Corporation [Astronics] and defendant Mark IV Industries, Inc. [Mark IV] are publicly held corporations, and their securities are registered with the Securities and Exchange Commission, pursuant to section 12(g) of the Securi-

ties Exchange Act of 1934. Protective Closures Co., Inc. [Protective Closures], the target of the proposed acquisition, is a privately held corporation, having 12,446 shares of capital stock held by about 41 record shareholders. It has been in business for about 34 years and was founded by Harry Winfield, who died without children, leaving his wife, Mabel Winfield. Many of the stockholders are related to the Winfields. The company has never made a public offering of any securities and has not been required to file any reports under the Federal Securities Act as a public company.

To understand the present motion, a brief recital of the events in the case of *Protective Closures Co., Inc. v. Astronics Corporation,* Civ. 82–1174C, is important. On December 23, 1982, Protective Closures made an application for a temporary order restraining defendant Astronics from continuing with an option of solicitation to obtain options on Protective Closures stock. The facts, according to the Protective Closures view, are set forth in the affidavit of Charles Percival, Jr., Docket Item 2 in Civ. 82–1174C. Mr. Percival, President of Protective Closures, related that on December 15, 1982, he became aware of an offer by Astronics to obtain options to purchase shares of Protective Closures. This offer was made in a letter dated December 13, 1982, Docket Item 2, Exhibit A. Astronics had sent the letter to all Protective Closures shareholders, giving an option price of $5 per share, with a total purchase price of $650 per share. The option agreement provided that it had to be returned to Astronics not later than January 1, 1983. It also stated that Marine Midland Bank, as trustee of estates holding 2,500 shares of stock, had given Astronics an option for its shares without disclosing the terms of that option agreement. The letter also said that Astronics had an option at that time for about 30 percent of the outstanding shares of Protective Closures.

According to Mr. Percival, the offer failed to disclose the source of funds to be used to purchase the shares, the plans of Astronics concerning the future of the company, whether it would exercise some but not all of the options, and that it failed to set forth its plan to protect plaintiffs' employees and their rights. Newspaper reports about the solicitation appeared in several editions of Buffalo and area newspapers on December 16, 1982. Percival claimed that these reports were false, because one newspaper article made it appear that the acquisition was a completed act rather than a solicitation of options. He also claimed that the article falsely stated that Percival and Neil R. Farmelo would be expected to continue to manage the company.

Because the Protective Closures Board believed that the offer was not a good one, a letter was sent to shareholders by Mr. Farmelo on December 17, 1982 (Exhibit E to Percival Affidavit), advising the shareholders that the Board believed that the proposal should be rejected. Based upon the information contained in the Percival affidavit and other information brought to my attention on December 23, 1982, I issued a temporary restraining order and set a hearing on the application of Protective Closures for a preliminary injunction for December 29, 1982.

Due to subsequent events, no hearing was held on the application of Protective Closures for a preliminary injunction. During informal meetings held early in the week of December 25, 1982, the court explained to counsel for Astronics that they were free to make another offer if they desired. During that week and continuing to the present, Astronics has represented that it desires to make another offer but has not done so as yet.

The question of the validity of the temporary restraining order in the Astronics case is not before me at the present time. It was entered after discussion with the lawyers about the facts related in the affidavits and reliance upon *Wellman v. Dickinson,* 475 F.Supp. 783, (S.D.N.Y.1979) *aff'd* 682 F.2d 355 (2d Cir.1982).

Defendant Mark IV entered the fray on December 23, 1982, when a stock purchase memorandum was executed between Mark

IV and certain principal shareholders of Protective Closures. Astronics then filed the instant action, naming Mark IV and Protective Closures as defendants. Astronics has made an application for a temporary restraining order and preliminary injunction prohibiting the execution of the Mark IV stock purchase memorandum agreement. Astronics primarily claims that the transaction between the defendants is a tender offer, containing material misstatements and omissions, and therefore, the execution of the agreement should be restrained, pursuant to section 14(e) of the Securities Exchange Act of 1934 as amended.

The facts on the present application are set forth in the affidavit of Kevin Keane, President of Astronics, the affidavit of Sal H. Alfiero, Chairman of the Board of Mark IV, and exhibits which are attached to the memoranda filed by Astronics and Mark IV. According to Mr. Alfiero, preliminary discussions were held with Protective Closures officers and him concerning the possible acquisition of Protective Closures, but nothing came of these meetings. However, when Mr. Alfiero saw a newspaper article on December 16, 1982, about the Astronics-Protective Closures takeover bid, he contacted Mr. Farmelo to tell him that Mark IV would be interested in making an amicable acquisition of Protective Closures' stock. When Farmelo told him that he believed that the Astronics offer was grossly inadequate, Alfiero met with his associates in Mark IV, and these conversations resulted in a series of meetings between Mark IV and Protective Closures representatives. At the same time, he arranged a financing commitment with a bank to provide capital of about $10 million to complete the acquisition of Protective Closures.

During the evening of December 23, a firm agreement was reached between Mark IV and some of the principal shareholders of Protective Closures for the purchase of a minimum of 51 percent of the 12,440 outstanding shares of Protective Closures, at $800 a share. This agreement is set forth as Exhibit E to Astronics' submission on the motion. In addition to agreeing to pay the shareholders $800 a share, the agreement also provided that if the transaction closed on or before January 10, 1983, Mark IV agreed to make an offer to purchase all remaining Protective Closures shares at the same price and terms. Later, this offer to purchase to outside shareholders was extended to March 3, 1983, if necessary.

All of the directors of Protective Closures were at the December 23 meeting with counsel, and Mark IV released the terms of the agreement to the *Buffalo News* on December 24 and 27, 1982. The shareholders who executed the agreement consisted of Harold Farber, a director who was not a member of the Winfield family group, and, essentially, four family groups represented by Neil Farmelo, Charles Percival, Jr., Robert E. Babcock, Dr. Robert H. Evans, Jr., and Paul Dray. An analysis of the relationships between the directors and the Winfield family members who held stock is set forth at pages 5–7 of the Mark IV memorandum.

Turning to the various claims presented by the parties, there are several matters which are only briefly considered. It appears that a losing tender offerer in the position of Astronics does not have a private cause of action for damages against the successful bidder on the target company. *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). The United States Supreme Court held in *Piper* that a defeated tender offerer was not within the category of those that the statute was intended to protect. Perhaps plaintiff Mason Winfield, as an individual shareholder, may assert a cause of action for damages, but this action could also be taken up in a proceeding subsequent to the completion of the Mark IV transaction. Under the authority of cases like *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (6th Cir.1982), there may be a cause of action by Astronics to obtain an injunction. However, the analysis used by the court in *Marathon,* based upon the United States Supreme Court's decision in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), is subject to serious question in light of more recent cases decided by the Su-

preme Court and other courts. Indeed, even the right to a claim of injunctive relief may not be appropriate. *See, e.g., Marshall Field & Co. v. Icahn,* 537 F.Supp. 413, 422 (S.D.N.Y.1982).

It appears also that Astronics does not have cause under section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)(5), *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), since the provisions of Rule 10(b)(5) apply only to purchasers and sellers of securities. *See also Iroquois Industries, Inc. v. Syracuse China Corp.,* 417 F.2d 963 (2d Cir.1969). This analysis would also apply to plaintiff Winfield, since there is a no-purchaser sale at this time by Mark IV.

■ Concerning plaintiff's request for a preliminary injunction, in attempted corporate takeover cases such as this, the standard requires the movant to make a clear showing of either

> (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Sonesta International Hotels v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir.1973). Further, the court notes that in tender offer cases, a preliminary injunction "is an 'extraordinary and drastic remedy which should not be routinely granted,'" *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir.1981), *quoting Medical Society of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977).

Plaintiffs seek a temporary restraining order and a preliminary injunction in order to halt the consummation of a contract between defendant Mark IV and certain Protective Closures stockholders. The effect of this contract would give Mark IV majority control of the Protective Closure's stock. Plaintiffs contend that the Mark IV agreement with these stockholders constitutes a tender offer, which violates section 14(e) of the Williams Act. [15 U.S.C. § 78n(e).]

They argue that Mark IV's "Stock Purchase Memorandum" failed to disclose certain facts concerning executive employee contracts entered into between Protective Closures and Protective Closures personnel who were also officers and directors of the company. Plaintiffs contend that this concealment constitutes a manipulative act in connection with a tender offer.

Many of the plaintiffs' allegations were refuted by the defendants during the course of extended oral argument on plaintiffs' motion heard on January 5, 1983. For instance, plaintiffs contend that the Protective Closures employees subject to the Mark IV negotiated contracts would receive a salary regardless of whether this salary was earned. Defendants maintain that the contract requires full-time work for full-time pay. (Exhibit H, Docket Item 6). Plaintiffs also argued that the employment agreements paid these employees exorbitant sums of money. It now appears that the salaries are equivalent to the present salaries paid by Protective Closures for at least the last three years, and that stockholders were informed that Mark IV would maintain "all existing written employment contracts between executive officers and the Company." Further, even if the Memorandum contains misstatements and omissions of material facts, section 14(e) will only apply if the Memorandum constitutes a tender offer. *E.H.I. of Florida v. Insurance Company of North America,* 499 F.Supp. 1053, 1063 (E.D.Pa.1980). As already discussed, Astronics also claims violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10(b)(5), 17 C.F.R. § 240.106–5. These allegations are primarily based upon alleged misleading statements or omissions concerning the employment contracts and the status of Astronics' prior tender offer to Protective Closures stockholders in the Mark IV offer.

■ Defendants have not directly responded to these allegations. Nevertheless, since virtually all of plaintiffs' contentions concern the now-clarified employment contracts, these specific contentions fail to re-

veal a clear showing of probable success on the merits. Concerning the "serious questions going to the merits" test, the court need not decide this unless the balance of hardships tips decidedly in favor of the movant. *Buffalo Forge Co. v. Ampco-Pittsburgh Corp., supra* at 569. For the reasons herein stated, the court finds that the balance of hardships tips decidedly in favor of the Protective Closures stockholders who seek to consummate their agreement with Mark IV.

■ Plaintiffs further contend that under state law, an agreement by two directors of Protective Closures acting as trustees to sell Protective Closures stock to Mark IV presents a conflict of interest and is a breach of fiduciary duty. Defendants have argued that this pendent state law claim is specious and that plaintiff Winfield, acting as trustee, made a similar agreement with Marine Midland Bank when he negotiated the Astronics option with the bank.

Nevertheless, the court finds that the alleged breach in this action does not present a clear showing of irreparable injury to the 11 beneficiaries involved, only one of whom seeks to challenge the trustees' decision. Further, roughly half of the beneficiaries of this trust have also decided to sell their own stock to Mark IV, and under these circumstances, the balance of hardships does not tip decidedly in favor of the movant.

Concerning the alleged section 14(e) violations, defendants contend that the agreement for the sale of stock between Mark IV and the Protective Closures stockholders was not a tender offer but a privately negotiated transaction. It is the position of Mark IV that the Williams Act does not apply to this particular transaction; it contends that the negotiations with Protective Closures were conducted privately, at arm's length with attorneys, and that the directors and the shareholders are a closely related family group who voluntarily agreed to sell their shares. Further, Mark IV maintains that those who had the authority to act for the shareholders had adequate information, and there was no public announcement of the proposed offer.

Mark IV also argues that there are no reported cases applying the Williams Act to a private company such as Protective Closures. Nevertheless, this court believes that it was the intent of the legislators to protect stockholders in a corporation like Protective Closures, as well as shareholders who invest in corporate stock that is publicly traded.

■ At the same time, however, privately negotiated transactions remain outside the scope of section 14, *Wellman v. Dickinson, supra* at 817, since the "sole purpose of the Williams Act [is] the protection of investors who are confronted with a tender offer." *Piper v. Chris-Craft Industries, Inc., supra* 430 U.S. at 35, 97 S.Ct. at 946.

■ There is no precise definition of a tender offer or a privately negotiated transaction, and the "exact line between a privately negotiated transaction and a public tender offer has not been ... identified." *Wellman v. Dickinson, supra* at 818, *quoting Heine v. The Signal Companies, Inc.* [1976–1977] C.C.H.Fed.Sec.L.Rep. ¶ 95,898 at 91,-320 (S.D.N.Y.1977). Indeed, there appears to be little authority concerning the application of section 14(e) to a small, privately held corporation whose stock has never been registered or even sold before. Both parties agree, however, that the leading case which sets forth the criteria for determining whether a tender offer has been made is *Wellman v. Dickinson, supra.* These criteria are:

1. Active and widespread solicitation of public shareholders for the shares of an issue;

2. Solicitation made for a substantial percentage of the issuer's stock;

3. Offer to purchase made at a premium over the prevailing market price;

4. Terms of the offer are firm rather than negotiable;

5. Offer contingent on the tender of a fixed number of shares;

6. Offer open for a limited period of time;

7. Offerees are subject to pressure to sell their stock;

8. Public announcement of a purchase program for the target company.

*Id.* at 823–24.

Turning to the first factor, there are approximately 41 shareholders of Protective Closures, most of whom are family-related. Mark IV admits to contacting about 20 of these shareholders and obtaining agreements from all these individuals to purchase their stock. These agreements resulted in contracting for about 57 percent of Protective Closures' shares.

In the *Wellman* case, the court found the solicitation and acquisition of 34 percent of the outstanding shares from 39 individuals to be "active and widespread" solicitation. *Id.* at 824. On the other hand, the court in *Stromfeld v. The Great Atlantic & Pacific Tea Company, Inc.,* 484 F.Supp. 1264 (S.D. N.Y.1980), found that secret negotiations resulting in the sale of 42 percent of Atlantic & Pacific stock by seven institutional and individual investors did not constitute active and widespread solicitation. Thus, any determination must turn on the facts of the individual case.

As Judge Carter related in *Wellman v. Dickinson, supra* at 818, the direct line between a private and public offer has not been identified, but it would appear that arm's length negotiations between two persons epitomizes a private transaction. He continues: "As the number of actors increases, the identifiable characteristics of a private activity become blurred." He found that the circumstances in that case presented a public solicitation. I believe his analysis supports a finding of a private act here.

In this case, one of the most significant factors is that virtually all the stockholders involved in the Mark IV contract are related to Protective Closures' officers and directors. Both Protective Closures and Mark IV maintain that the shareholders with whom it negotiated were represented by these officers and directors during the negotiations between the two companies. Defendants argue that the Protective Closures stockholders are essentially members of four family groups and that the shareholders involved in the contract are almost all either married to each other, aunts or uncles, or sons or daughters, or trustees acting on behalf of mothers or fathers, aunts or uncles, or sons or daughters. They contend that the most distant family relationships among the selling stockholders are two cousins. The only non-family stockholder who signed the agreement is the First Presbyterian Society of Lewiston, which owned 60 shares.

In its evaluation, the *Wellman* court considered whether there was "a common characteristic binding the solicitees together," in addition to the solicitees' ownership of stock in the target company. *Wellman v. Dickinson, supra* at 818. The facts of this case are accentuated by the close family relationship of the selling stockholders to one another and to the officers and directors of Protective Closures. The strong stockholder family affiliation and the status of Protective Closures as a small, closely held corporation are sound indications that such binding characteristics exist here. *See also Nachman Corp. v. Halfred, Inc.,* C.C.H.Fed.Sec.L. Rep. ¶ 94,455 (N.D.Ill.1973). In that case, the court found a private transaction where the persons whose shares were solicited were either directors or substantial shareholders, or both.

Further, the small number of stockholders involved, their close family relationship, and defendants' contentions that negotiations between Mark IV and the stockholders were carried out by the Protective Closures executives acting on behalf of their families, presents a very different factual situation from the broad tender offer solicitations made to the disparate, 100-member Hoover family in *Hoover Co. v. Fuqua Industries, Inc.,* C.C.H.Fed.Sec.L.R. ¶ 97,107 (1979). Under these circumstances, it is difficult to see how these family-related investors were forced to make "uniformed, ill-considered decisions to sell." *Kennecott Copper Corp. v. Curtiss Wright Corp.,* 584 F.2d 1195, 1207 (2d Cir.1977).

■ Concerning factors (2) and (5), the Mark IV solicitations appear to have been made for a substantial percentage of Protective Closures stock, and the offer was contingent upon the tender of a fixed number of shares. Nevertheless, these facts in and of themselves are not determinative of whether the solicitation is a tender offer. *Stromfeld v. Great Atlantic & Pacific Tea Company, Inc., supra* at 1273.

The third factor involving the market price and whether Mark IV's offer can be considered a "premium price" is difficult to evaluate. Since Protective Closures' stock is not publicly traded and has no "prevailing market price," the $800 per share offer can only be considered a "premium" in relation to the Astronics tender offer of $650 per share. Yet, admittedly, the Astronics offer was made "without benefit of the financial statements or other information such as would be required to be made available by a publicly reporting company." (Defendants' Brief in Civ. 82–1177C, Docket Item 9, p. 7.) Thus, without some accurate yardstick, it is impossible to determine whether the Mark IV offer is a premium offered above the prevailing market price.

Concerning factor (4), whether the terms of the offer were fixed and factor (6), whether the offer was open for a limited period of time, the court must look to the events surrounding the transaction in order to apply these factors. Defendants argue that unlike a typical tender offer, the terms of the stock purchase agreement became "fixed" only after extensive negotiations undertaken at arm's length between the selling stockholders and Mark IV prior to the execution of the selling agreement. They contend that these negotiations resulted in a bilateral contract, and because all the shareholders involved voluntarily offered to sell their stock to Mark IV, there was no deadline forcing a shareholder to make a decision as to whether he or she should sell to Mark IV. Under these circumstances, it is difficult to accept plaintiffs' contentions that these factors support tender offer indicia.

Defendants also contend that there was no pressure placed upon the Protective Closures shareholders to sell their stock (factor 7). They contend that the only shareholders who executed the purchase agreement with Mark IV "were those who gave their prior consent to sell to Mark IV when the agreement was executed by the parties." (Defendants' Memorandum in Opposition to Plaintiffs' Request for a Preliminary Injunction, Docket Item 8.) Given the close family relationships involved here, particularly to the Protective Closures directors and officers involved in the negotiations, these stockholders are "hardly the uniformed security holder[s], unable to tend for [themselves], who [need] the protection of the Williams Act." *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 449 F.Supp. 951, 961 (S.D.N.Y.1978), *aff'd*, 584 F.2d 1195 (2d Cir.1977).

Finally, concerning factor (8), both plaintiffs and defendants agree that there was no publicity surrounding the Mark IV offer.

■ "[T]he sole purpose of the Williams Act [is] the protection of investors who are confronted with a tender offer." *Piper v. Chris-Craft, Industries, Inc., supra* 430 U.S. at 35, 97 S.Ct. at 946. Based upon the present record, I am not satisfied that plaintiffs will be able to prove that this is such a transaction. At first blush, it may seem inconsistent and even contradictory that a restraining order was issued against the Astronics offer in late December. It appeared to be a tender offer, while the present transaction does not. The court believes there are essential differences between the two circumstances. The Astronics option was circulated generally to the shareholders of Protective Closures, while the Mark IV offer was submitted face-to-face and not executed until there had been extensive discussion between the parties. The Astronics offer was on a take-it-or-leave-it basis, with a fixed date to comply. There was a public announcement imposing a time pressure, while the negotiations between Mark IV and Protective Closures did not have a time deadline. The negotiations were intensive, it is true, but there was no time deadline. There was no assurance in the Astronics offer that all shareholders

would be treated equally, while the Mark IV agreement provides that all will receive $800 a share if they desire.

The offer of Astronics did not set forth its financing arrangement with any detail, while the directors of Protective Closures were able to examine the Mark IV financial commitment carefully before making their decision. The Astronics offer is an option only which Astronics is not bound to honor, while the Mark IV arrangement commits that corporation to close by January 10.

In the Astronics offer, the court has found that there is a number of possible misrepresentations which may visit hardship eventually upon the stockholders of Protective Closures. While as previously discussed in the Mark IV offer, there are no representations which would require action by the court if the Williams Act applied. To the court, it appears that there are many distinctions between the two transactions, the Astronics offer coming within the tender offer definition of the *Wellman* case, while the Mark IV transaction does not.

Although the court makes no determination of the merits of this case, plaintiffs have not established a clear showing of probable success on the merits required for a preliminary injunction to issue.

Turning to the balance of hardships test, *see Buffalo Forge Co. v. Ampco Pittsburgh, supra* at 569, the parties have repeatedly stated that they are all acting in the best interests of the shareholders. It is important to remember that this litigation was commenced as a result of Astronics' $650 offer to the Protective Closures shareholders on December 13, 1982. Since that time, the shareholders have been presented with another substantially different offer for purchase of their shares. Since December 29, 1982, Astronics has been free to make a counter offer to the Mark IV proposal, and as yet, it has not done so. The original Astronics offer never specified the number of shares it was seeking to purchase, although the press release issued by Astronics mentioned that they sought to control Protective Closures.

On the other hand, Mark IV has apparently negotiated a private agreement for purchase of stock with some of the Protective Closures stockholders and has offered to purchase all of the remaining outstanding Protective Closures shares for $800 per share. With all these facts in mind, the balance of hardships tips in favor of the shareholders who, having negotiated what appears to be a privately negotiated sale of their stock, should not now be deprived of the opportunity to consummate the sale of their shares. Astronics believes that it may be able to offer the Protective Closures stockholders a better offer, but this offer has not been forthcoming. In the interests of equity and fairness, all Protective Closures shareholders should be given an opportunity to sell their stock at the price Mark IV has offered, should they so choose. For these reasons, the court believes that the balance of hardships tips in favor of the shareholders.

Accordingly, for the foregoing reasons, plaintiffs' motion for a temporary restraining order and a preliminary injunction must be denied.

So ordered.