## IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON    MAY 1999 SESSION

WILLIAM CRAIG HALL,              )
CAROLYN CARRINGTON               ) SHELBY CHANCERY
CRUMP,                           )        (No. 106795-3)
LOURA THOMAS,                    )
GRACE JAMISON,                   ) APPEAL NO. 02A01-9810-CH-00288
and MARIE SAMMONS,               )
    Plaintiffs/Appellees         )
v.                               )
                                 )
DON SHAW,                        )
    Defendant/Appellant          )
and                              )
COLLIERVILLE AUCTION             )
COMPANY,                         )
    Defendant/Appellee           )

<div style="text-align:center; border:1px solid #000;">

# FILED

**July 12, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

</div>

_____
_

R. WILLIAM (BILL) SKINNER,       )
MRS. BRYAN COOP,                 ) SHELBY CHANCERY
JAMES LOONEY,                    )        (NO. 109365-3)
B. J. DUNAVANT, Administrator    )
Pendente Lite of the Estate of   ) APPEAL NO. 02A01-9810-CH-00288
JAMES GLENN,                     )
CECILIA WALLRAVEN,               )
MRS. EARL SEWARD,                )
MARGARET SADLER,                 )
NORMA COULTER NEWMAN,            )
and HAROLD COHN,                 )
    Plaintiffs/Appellees         )
v.                               )
                                 )
DON SHAW,                        )
    Defendant/Appellant          )

APPEAL FROM THE CHANCERY COURT OF SHELBY COUNTY
AT MEMPHIS, TENNESSEE
THE HONORABLE D. J. ALISSANDRATOS, CHANCELLOR

| **For the Appellant:** | **For the Appellant:** | **For the Appellees:** |
|---|---|---|
| Jeff Germany | Joel Porter | Stephen Beem |
| 200 Jefferson, #725 | 130 North Court | 100 North Main, Suite 3201 |
| Memphis, TN 38103 | Memphis, TN 38103 | Memphis, TN, 38103 |

**AFFIRMED in part,
REVERSED in part,
REMANDED**

**WILLIAM H. INMAN, Senior Judge**

**CONCUR:**

**ALAN E. HIGHERS, JUDGE
HEWITT P. TOMLIN, JR., SPECIAL JUDGE**

# **O P I N I O N**

## **I**

The Collierville Auction Company (CAC) was issued a corporate Charter in 1947. Acting through its ten incorporators, we deduce, as a de facto Board of Directors it issued 207 shares of stock, each of the par value of $100.00, acquired eight acres of land, constructed buildings, and promptly commenced its corporate purpose of livestock auctioning.

The defendant Shaw purchased one share of CAC in 1961, and has been its auctioneer, lessee, and general factotum for 37 years, as of February, 1998. Through 1994 he owned 23 shares of CAC, which had 143 shareholders. Beginning February 1, 1995, through June 23, 1995, he purchased an additional 104 shares from 57 shareholders, at prices ranging from $300.00 to $4,000.00 per share.

This spate of activity generated this litigation. The initial complaint was filed by *Hall,* individually and on behalf of all similarly situated shareholders of CAC,[1] alleging that the defendant Shaw had directed the putative Board of directors to call a special meeting, at which time he intended to install his own Directors, since he owned more than 50% of the shares of CAC. The plaintiffs alleged that Shaw had illegally acquired the shares and sought an order restraining him from proceeding further. The complaint was amended in January, 1996, with *Hinton, Crump, Thomas, Jamison, Sammons* and *Leake* joined as additional plaintiffs, all of whom had sold their shares to Shaw. Each alleged that Shaw had misrepresented the value of their share.

---

[1]A class action was not pursued by Hall.

## II

When initially issued in 1947, each stock certificate bore this restriction:

> Transfer or assignment of the within stock is governed by the bylaws of the Corporation which limits each stockholder to one vote regardless of the extent of stock ownership.

This restriction was authorized by Article III of the Bylaws which provided that "each stockholder shall be entitled to cast one vote regardless of the amount (sic) of shares held in his name." At this juncture it is important to note that the Charter contained no such restriction, and that T.C.A. § 48-311, then in effect, provided

> Right to Vote - Unless otherwise provided in the certificate of incorporation . . . every stockholder of record . . . shall be entitled . . . to one vote for each share of stock . . . .

Responding to the assertion of the plaintiffs in *Hall* that he only had one vote, the defendant Shaw alleged that the restriction was invalid because the Charter did not "otherwise provide", and consequently that he was entitled to one vote for each share he owned, thus giving him control of the corporation.

## III

The plaintiffs in *Hall* further alleged that the defendant Shaw violated the Tennessee Investor Protection Act, T.C.A. § 48-103-101 *et seq.,* (TIPA), which governs a hostile takeover of a Tennessee corporation. It was stipulated that in January, 1995, CAC had 207 outstanding shares with 85 shareholders, and that by August 1995, Shaw had acquired, by purchase, 104 shares from 65 owners. The Hall plaintiffs alleged that Shaw's actions amounted to a takeover or tender offer and that he made no effort to comply with TIPA.

In response to the allegation that he violated TIPA, Shaw denied its applicability because he made no tender offer for the shares, but merely negotiated privately with each shareholder.

**IV**

On April 23, 1997, the plaintiffs *Skinner* and *Seward* filed a class action against Shaw, on behalf of themselves and others similarly situated, alleging that they and 6 other shareholders in CAC sold their shares to Shaw during a period from January, 1995 to August, 1995, and that the defendant failed to comply with TIPA. They sought rescission of their stock sales and certification as a class action.

The defendant Shaw responded that TIPA was inapplicable because his purchases were individually negotiated transactions, and that the plaintiffs' claims were barred by the Statute of Limitations of two years.

**V**

The motion to certify the class was denied, but the Court granted the Skinner plaintiffs three weeks within which to amend to add additional plaintiffs. Whereupon, the plaintiff *Skinner* amended his complaint to add *Dean, Thorton, Nolley, Morton, Coop, Dunavant, Estate of Glenn, Wallraven, Seeward, Sadler, Pierce, Newman* and *Cohn* as plaintiffs, all of whom alleged that they sold their stock to Shaw between January and August, 1995, and that he had falsely misrepresented the value of the stock.

The *Hall* case and the *Skinner* case were consolidated. The parties agreed to submit the matter on the written record which included an extensive Stipulation of Fact, and more than 200 pages of Exhibits.[2]

---

[2]One of the defendant's issues is directed to the action of the Court in granting a *sua sponte* motion for summary judgment in the *Hall* case. The plaintiff is somewhat exercised

4

## VI

In *Hall,* the Court found:

A. T.C.A. § 48-311 was in full force and effect in March of 1947, that being the date when Collierville Auction Company's Charter of Incorporation was filed with the Tennessee Secretary of State;

B. The Certificate of Incorporation of Collierville Auction Company did not provide any provision or restriction concerning any limitation binding any stockholder to one vote regardless of the extent of stock ownership;

C. The bylaws of Collierville Auction Company limiting the voting rights of shareholders to one vote regardless of ownership of stock and the printed proclamation of same, appearing on the physical stock certificate of Collierville Auction Company denoting said restriction had no force and effect; each share of Collierville Auction Company is entitled to one vote;

D. The Tennessee Investor Protection Act, T.C.A. § 48-103-101 *et seq,* applied to the facts before the Court; the actions of Don Shaw between February 1995 and August 1995 constituted "a takeover offer" as defined in T.C.A. § 48-103-102(10)(A); Shaw did not comply with T.C.A. § 48-103-104 concerning registration of takeover offers and did not comply with T.C.A. § 48-103-112 *CIVIL LIABILITIES* and Plaintiffs Thomas, Jamison, Crump, and Sammons were entitled to recover their respective one share of Collierville Auction Company stock previously sold to Defendant Don Shaw upon tendering the consideration previously received from Shaw.

## VII

In *Skinner,* the Court granted summary judgment in favor of Plaintiffs Coop, Looney, Dunavant, Wallraven, Seward, Saddler, Newman, and Cohn on July 16, 1998, holding that the Statute of Limitations accrued on May 13, 1995, and that the Plaintiffs sold their shares within two years of accrual. The summary judgment rescinded the sale to Shaw conditioned upon a return of the purchase price.

## VIII

*Shaw* appeals, insisting that TIPA is inapplicable, and that the *Skinner* plaintiffs failed to commence their lawsuit within two years of accrual within the

---

about this issue, insisting that no summary judgment was considered or granted, and that the case was decided on its merits. We agree that the parties submitted the case on Stipulated Facts, with Exhibits.

meaning of T.R.C.P. Rules 3, 4, and 5. The *Skinner* plaintiffs appeal from the denial of their motion for class certification. *CAC* appeals, insisting that the "one man one vote" provision is valid, contrary to the finding of the Chancellor.

Our review of the findings of fact made by the trial Court is *de novo* upon the record of the trial Court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. TENN. R. APP. P., RULE 13(d); *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26 (Tenn. 1996). Where there is no conflict in the evidence as to any material fact, the question on appeal is one of law, and the scope of review is *de novo* with no presumption of correctness accompanying a chancellor's conclusions of law. *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87 (Tenn. 1993).

## IX

This record reflects that CAC, since 1947, had operated continuously pursuant to the now-disputed Bylaw. The voting restriction, which was accepted and unchallenged for 50 years, provided that a shareholder has only one vote on any corporate matter regardless of how many shares he owns. Every stock certificate that has been ever issued to any shareholder of CAC contained the restriction.

The Defendant Shaw operated the auction without a written lease for 37 years. From 1960 to 1995 he purchased 23 of 207 outstanding shares. As of January 1, 1995, there were 85 individual shareholders of CAC.

In early 1995, the defendant commenced his acquisition of additional shares in order to gain majority control of the corporation. He purchased 81 shares from approximately 50 different people or entities which, as of January 1, 1996, resulted in majority ownership.

6

His plan (although never communicated to plaintiffs Crump, Jamison, Thomas and Sammons) was to change the Bylaws of the corporation by eliminating the "one man one vote rule." His further intent was to elect a new Board of Directors.

The Chancellor did not address the specific complaint of plaintiffs Crump, Thomas, Jamison and Sammons, who testified that the defendant Shaw made false representations to them or omitted material facts which prompted them to sell their stock to him substantially below its value. These plaintiffs are all elderly widows, who had no knowledge of the value of the stock, as contrasted to the knowledge of the defendant. He was aware that the eight acres of real estate which CAC owned was becoming increasingly valuable, but never communicated that information to any of these plaintiffs. Rather, he demeaned the stock and in one instance stated that it may never pay dividends again. The Chancellor apparently was of the view that the failure of the defendant to comply with TIPA adequately redressed the rights of these plaintiffs.

## X

The Tennessee Investor Protection Act was enacted by the legislature in 1976. It regulates the activities of whoever makes a "takeover offer" for the equity securities of a company incorporated within the State of Tennessee. By the terms of the Act, a person contemplating an offer which may be deemed a "takeover offer" must first either register his takeover offer or seek an exemption from the Commissioner of Commerce and Insurance. T.C.A. § 103-104. The offeror must disclose to the persons from whom he intends to acquire the securities the fact that he intends to change or influence the management or control of the target company if such is the fact and he must file a statement of his intention to gain control of the

7

target company with both the Commissioner of Commerce and Insurance and with the target company itself. T.C.A. § 48-103-103(a). In the event that the offeror varies the terms of the takeover offer from one offeree to another, he must pay the increased consideration to all sellers of the shares of the target company. T.C.A. § 48-103-103(e).

Appellant Shaw concedes that he failed to make any effort to file the required registration statement with the Commissioner of Commerce and Insurance and did not seek an exemption from the Act. He concedes that he has paid different shareholders of Collierville Auction Company different amounts for their shares of common stock. Shaw thus violated the Investor Protection Act if it is applicable to the facts of these cases.

"Takeover offer" is defined as follows:

48-103-102 (10)
>(A). "Takeover offer" means the offer to acquire or the acquisition of any equity security of an offeree company, pursuant to a tender offer or request or invitation for tenders, if after the acquisition thereof the offeror would be directly or indirectly a beneficial owner of more than ten percent (10%) of any class of the outstanding equity securities of the offeree company;

>(B) "Takeover offer" does not include an offer to acquire or acquisition of any equity security of an offeree company pursuant to:

>>(I) Broker transactions effected by or through a broker-dealer in the ordinary course of its business when such transactions are not entered into for the purpose of, and not having the effect of, changing or influencing the control or management of the offeree company;

>>(ii) An exchange offer for equity securities of another issuer if the offer is for the sole account of the offeror, is in good faith and not for the purpose of avoiding this section, and is exempt pursuant to § 4 of the Securities Act of 1933, as amended, and does not involve any public offering;

8

(iii) An offer made in isolation transactions, for the sole account of the offeror, in good faith and not for the purpose of avoiding this section, to not more than fifteen (15) persons in this State during any period of twelve (12) consecutive months;

(iv) An offer made on substantially equal terms to holders of record of any class of the equity securities of the offeree company, if the number of such holders does not exceed fifty (50) at the time of the offer; or

(v) An offer made on substantially equal terms to all shareholders and as to which the offeree company, acting through its board of directors, has recommended acceptance to such shareholders, if the terms thereof, including any inducements to officers or directors which are not available to all shareholders, have been disclosed to such shareholders.

The appellant's offer does not fit within any of the exemptions set out in § 10(B) above. It was not a brokered transaction in the ordinary course of business as exempted in (B)(I); it was not an exchange offer pursuant to (B)(ii); it was not made to less than 15 persons in isolated transactions during a twelve month period as exempted by (B)(iii). In fact, it was made to 57 persons during a twelve month period. It was not made on substantially equal terms to less than 50 people as contemplated by (B)(iv). Finally, it was not approved by the board of directors or recommended by the board of directors as exempted by (B)(v). Therefore none of the defined exemptions exempted the transaction from the Act.

Appellant Shaw argues that his acquisitions were exempt because they were not made "pursuant to a tender offer or request or invitation for tenders" as contemplated by § 10(A). He relies upon federal cases construing substantially similar language contained in the Federal Securities Act known as the Williams Act. There are no Tennessee cases construing the term "takeover offer" or "tender offer."

Because the Williams Act applies only to securities registered with the Securities and Exchange Commission it is logical to assume that TIPA regulates takeover offers with respect to unregistered securities not regulated by the SEC. With respect to registered securities under the Williams Act there are requirements for the filing of annual financial statements and disclosures which give considerable protection to shareholders who are not insiders and thus not fully aware of the value of the securities.

The Williams Act, like TIPA, does not define the term "tender offer". A number of courts have indicated that this was a purposeful omission so as to relegate to the courts a broad discretion to apply the Act where necessary to effectuate its intent without being burdened by hard and fast rules which might not be sufficiently flexible to meet the needs of a particular situation.

With respect to the Williams Act, the SEC formulated an eight factor test which was first adopted by a court in the case of *Wellman v. Dickinson,* 475 F.Supp. 783, 823-824. The eight *Wellman* factors are:

(1)     active and widespread solicitation of public shareholders for the shares of an issuer;

(2)     solicitation made for a substantial percentage of the issuer's stock;

(3)     offer to purchase made at a premium over the prevailing market price;

(4)     terms of the offer are firm rather than negotiable;

(5)     offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased;

(6)     offer open only for a limited period of time;

(7)     offeree subjected to pressure to sell his stock;

(8)     public announcements of a purchasing program concerning the target company precede or accompany rapid accumulation of large amounts of the target company's securities.

The leading case defining a "tender offer" for purposes of the Williams Act is *Handon Trust PLC v. SCM Corp.,* 774 F.2d 47 (1985).  There, the court set out the eight factors previously recommended by the SEC and adopted in *Wellman* but proceeded to modify the eight factor test.

> Although many of the above-listed factors are relevant for purposes of determining whether a given solicitation amounts to a tender offer, the elevation of such a list to a mandatory "litmus test" appears to be both unwise and unnecessary.  As even the advocates of the proposed test recognize, in any given case a solicitation may constitute a tender offer even though some of the eight factors are absent or, when many factors are present, the solicitation may nevertheless not amount to a tender offer because the missing factors outweigh those present.  *Id.* at 824.  *Carter, supra,* at 950.

> We prefer to be guided by the principle followed by the Supreme Court in deciding what transactions fall within the private offering exemption provided by § 4(1) of the Securities Act of 1933, and by ourselves in *Kennecott Copper* in determining whether the Williams Act applies to private transactions.  That principle is simply to look to the statutory purpose.  In *SEC v. Ralston Purina Co.,* 346 U.S. 199, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), the Court stated, "the applicability of § 4(1) should turn on whether the particular class of persons affected need the protection of the Act.  An offering to those who are shown to be able to fend for themselves is a transaction "not involving any public offer."  *Id.,* at 125, 73 S.Ct. at 984.  Similarly, since the purpose of § 4(1) is to protect the ill-informed solicitee, the question of whether a solicitation constitutes a "tender offer" within the meaning of § 14(d) turns on whether, viewing the transaction in the light of the totality of circumstances, there appears to be a likelihood that unless the pre-acquisition filing strictures of that statute are followed there will be a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them.

*Hanson,* 774 F.2d 57.

The thrust of cases decided after *Hanson* is whether a particular transaction under consideration *needs* the protection of the Act.  In *Iavarone v. Raymond Keys Associates,* 733 F.Supp. 727 (S.D.N.Y. 1990), many of the eight factors set out by

11

the S.E.C. did not exist. There were only 25 shareholders involved and all but one were insiders. There were no public pronouncements or tenders and relatively small sums of money involved. The court summarized its opinion as follows at 733:

> Though it is unusual to apply the provisions of the Williams Act to the stock transaction of small companies with a limited number of shareholders, the caselaw clearly gives courts the discretion to apply the Act if its protections are needed. *See, L.P. Acquisition Co. v. Tyson,* 722 F.2d 201 (6th Cir. 1985); *Astronics Crop. v. Protective Closures Co., Inc.,* 561 F.Supp. 329 (W.D.N.Y. 1983). The Second Circuit has made clear that the true touchstone of the analysis is whether it is likely that solicitees will be given sufficient information to make a sound decision. *Hanson Trust, supra,* 774 F.2d at 57. Non-application of the Williams Act must be premised on all shareholders being sufficiently "inside" the corporation to make disclosure requirements superfluous. Plaintiff Iavarone is not currently an insider with respect to the financial status of RKA, and he lacks what the Court views as crucial data on the benefits and dangers of the transaction. The fact that Iavarone may be the only shareholder to lack access to such information makes this case peculiar, but it should not prevent him from benefiting from a statutory scheme whose object is to minimize uninformed decision making by corporate shareholders.

Similarly, in *Anago, Inc. v. Tecnol Medical Products, Inc.,* 792 F.Supp. 514 (N.D. Tex. 1992), the court stated the relevant test of "tender offer" as follows:

> The Second Circuit has cautioned against elevating the SEC's eight-factor analysis to a "mandatory litmus test," and has applied a second test to determine whether stock purchases constitute a tender offer. *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47 (2d Cir. 1985). In *Hanson,* the court inquired whether there is "a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them." *Id.* at 57. The court also asked "whether the particular class of persons needs the protection of the Act." *Id.* (quoting *S.E.C. v. Ralston Purina Co.,* 346 U.S. 119, 125 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953).

There is no evidence that the 57 people who were solicited by Shaw were sophisticated or that they were insiders or that they had access to any information regarding the financial affairs or condition of the company. The fact that the price

12

varied so markedly with respect to the 57 persons who sold to Shaw very strongly suggests that there was no reliable information as to the value of the stock.

Appellant argues that this was not a single fixed offer in the usual sense of a tender. None of the exemptions would have been necessary had tender offer been intended to mean only a single joint offer to a group of shareholders. It would not have been necessary to have exempted solicitations in 15 or less isolated transactions if isolated transactions were by definition not included in the first place. It would not have made sense to exempt companies with less than 50 shareholders if, as Appellant contends, the Act was only intended to apply to public companies which by definition have 500 or more shareholders and are regulated by the Federal Securities Law. We think the legislature intended to protect those investors not protected by the Federal Securities Law rather than only those persons as contended by Appellant who were already stockholders in publicly traded companies.

Appellant argues that the judgment holding him liable for his course of conduct is unconstitutional because TIPA is so vague as to offend due process. In the final analysis, the Chancellor voided Appellant's stock acquisitions because he did not comply with TIPA, and ordered him to return the stock to the claimants who would refund the purchase price. Due process is not offended. In any event, this issue was not raised in the trial court and cannot be considered by this Court. *Lawrence v. Standford,* 655 S.W.2d 929 (Tenn. 1983).

**XI**

CAC argues that the Chancellor erred in ruling that the restriction on the stock certificates was invalid. On the face of it, the ruling appears perfectly logical, since the Charter made no provision for such restriction, and the Statute

then in effect provided that every stockholder was entitled to one vote for each share of stock owned unless the Charter otherwise provided.

But CAC relies upon T.C.A. § 48-17-302, which provides:

48-17-302. Shareholders' agreement. -- (a) An agreement between two (2) or more shareholders, if in writing and signed by the parties thereto, may provide that, in exercising any voting rights, the shares held by them shall be voted as therein provided, or as they may agree, or as determined in accordance with a procedure agreed upon by them. Nothing in this subsection shall impair the right of the corporation to treat the shareholders of record as entitled to vote the shares standing in their names. A voting agreement created under this section is not subject to the provisions of § 48-17-301 and may be specifically enforced.

(b) No written agreement to which all or less than all the shareholders have actually assented, whether embodied in the charter or bylaws or in any agreement in writing signed by all the parties thereto, which agreement relates to any phase of the affairs of the corporation, whether to the management of its business or to the division of its profits or otherwise, shall be invalid as between the parties thereto on the ground that it is an attempt by the parties thereto to restrict the discretion of the board of directors in its management of the business of the corporation or to treat the corporation as if it were a partnership or to arrange their relationships in a manner that would be appropriate only between partners.

(c) A transferee of shares in a corporation whose shareholders have entered into an agreement authorized by subsection (a) or (b) shall be bound by such agreement if the transferee takes the shares with notice thereof. A transferee shall be deemed to have notice of any such agreement or any such renewal if the existence thereof is noted on the face or back of the certificate or certificates representing such share . . .

Subsection (b) authorizes agreements to which the shareholders "have actually assented" as contrasted to agreements fully and formally signed and executed by certain shareholders. It is clear that such agreements may be included in the bylaws of the corporation. Subsection (c) of the statute binds a shareholder who was not a party to the original agreement as reflected in the bylaws but who has notice of it by reason of an inscription upon his stock certificate. All of the original incorporators and shareholders entered into an agreement to vote their

shares based upon a majority vote of the shareholders and this agreement was imprinted upon the stock certificate in order to give notice of it to subsequent shareholders.

Subsection (b) of T.C.A. § 48-17-302 specifically provides for situations where shareholders of a corporation agree to manage their affairs in a manner normally adopted by partnerships rather than corporations, which is what the one man - one vote attempted to accomplish. T.C.A. § 61-1-117(5) of the Uniform Partnership Act specifically provides that absent an agreement to the contrary, each partner shall have an equal right in the management and conduct of the partnership business irrespective of his ownership interest in the partnership.

Since this bylaw provision included a provision consistent with partnership law but not corporate law, it would appear that it is authorized by § (b) of T.C.A. § 48-17-302 and enforceable if imprinted upon the stock certificate as it was. In *Pearson v. Hardy,* 853 S.W.2d 497 (Tenn. App. 1992), we held:

> In our opinion, 302(b) us directed at those agreements that in any way relate to the affairs of the corporation or which attempt to change the management of corporate affairs in a method or manner not contemplated by the Corporations Act.

The record fairly conclusively reveals that the incorporators of the CAC wanted to run their business more as a public service to farmers in the area and as a partnership than as a traditional corporation. They chose to do it by an agreement among the initial shareholders.[3]

---

[3]Once the Charter was issued, most of the incorporators apparently were content to govern the corporation from afar, because they seldom, if ever, attended board meetings. The trial court treated the bylaws as having been duly adopted; so will we. But no minutes reflect that a Board of Directors was formally elected, although the 50-year history of the corporation indicates that at all times a Board existed, but seldom was able to transact business owing to the lack of a quorum. It is a stipulated fact that the appellant was the Lessee of the CAC for more than three decades, apparently on a month-to-month basis, perhaps yearly. The Directors, at any rate, saw to the rental, and declared dividends. The corporation filed tax returns and otherwise generally complied with the law, so far as known. In a word, the community wanted an auction barn. They organized one, and did not thereafter spend much time or effort on the niceties.

> Bylaws, as a matter of law, are in the nature of a contract between the stockholders, and regulate the conduct and define the duties of the stockholders toward the corporation and among themselves, and do not become abrogated because they have simply been misplaced. While in force bylaws become as much a part of the law of the corporation as though they had been made a part of the charter.

Tenn. Juris. Corp. § 17.

For 50 years, the restriction was honored. The appellant was content with it for 37 years. The equities resound loudly against him in light of his manifest purpose of acquiring control of the corporation for financial gain at the expense of those who were unaware of the value of their holdings. We are accordingly constrained to disagree with the able Chancellor and hold that within the ambit of the facts of these cases the restriction emblazoned on the stock certificates is valid and enforceable.

## XII

The appellant argues that 12 additional plaintiffs in the *Skinner* case failed to commence their action "within the meaning of Rules 3, 4, and 5 of the Tenn. R. of Civ. Pro." essentially because no summons was issued, and the two-year statute of limitations barred the action.

Skinner filed his initial complaint on April 23, 1997. The amended complaint which added the "new" plaintiffs, was filed December 8, 1997. It was served on counsel for the appellant, who contends that the issuance of a summons was necessary to the viability of this case.,

These "new" plaintiffs respond by asserting that the sufficiency of service of process was never an issue before the trial court, and that any objection to process was waived, because the appellant filed substantive responses to all of the

pleadings.  Our examination of the record reveals that the sufficiency of process was not a timely issue, and that the appellant had adequate notice of the joinder of the *Skinner* plaintiffs.  *See, Dixie Sou. Stores, Inc. v. Turner,* 767 S.W.2d 408 (Tenn. 1988).  The joinder of these plaintiffs occurred before their actions were barred.

### XIII

The final issue is whether the court erred in denying Skinner's motion for class certification, essentially because certifying the class would have eliminated any doubt about the bar of the statute of limitations.  A class action is a procedural privilege to be utilized within the sound discretion of the trial judge.  *Hamilton v. Gibson County Utility District,* 845 S.W.2d 218 (Tenn. App. 1992); *Warren v. Scott,* 845 S.W.2d 780 (Tenn. App. 1992).  No abuse of discretion is shown.

The judgment is affirmed except as to the issue of the stock certificate restriction which is reversed.  Costs are assessed to the appellant.  The case is remanded for all appropriate purposes.

_____

William H. Inman, Senior Judge

CONCUR:

_____

Alan E. Highers, Judge

_____

Hewitt P. Tomlin, Jr., Special Judge